# EXHIBIT "A"

LSO–423

NON-EXCLUSIVE LICENSE AGREEMENT BETWEEN
THE CITY OF LOS ANGELES AND

Skyhop Global Llc

COVERING CHARTER PARTY CARRIER TRANSPORTATION
SERVICES TO AND FROM LOS ANGELES INTERNATIONAL AIRPORT

THIS NON-EXCLUSIVE LICENSE AGREEMENT (the "**License**"), made and entered into this _15th_ day of _____March_____, 20<u>21</u>, by and between the CITY OF LOS ANGELES, a municipal corporation ("**City**"), acting by order of and through its Board of Airport Commissioners ("**Board**"),and Skyhop Global Llc (**Licensee**"),

## **RECITALS**

WHEREAS, City owns and operates Los Angeles International Airport ("**Airport**") in the City of Los Angeles, State of California;

WHEREAS, Licensee is 1) the holder of a charter party carrier permit issued by the Public Utilities Commission of the State of California ("**P.U.C.**"), authorizing Licensee to transport passengers to and from Airport on a pre-arranged charter basis with charges assessed on a vehicle mileage or time of use basis, or a combination of the two; or 2) the holder of authority granted by the United States Department of Transportation ("**USDOT**") to conduct similar transportation activities; or 3) the holder of an auto-for-hire permit issued by the City of Los Angeles Department of Transportation ("**LADOT**");

WHEREAS, Licensee desires to operate the previously described transportation service at Airport and to enter into this License with City in order to conduct such operations; and

WHEREAS, it is in the best interests of City and the traveling public to make such services available.

NOW, THEREFORE, in consideration of the use of the premises and of the covenants and conditions hereinafter contained to be kept and performed by the parties hereto, IT IS MUTUALLY AGREED AS FOLLOWS:

## **LICENSE**

### **ARTICLE 1.  SPECIFIC TERMS AND PROVISIONS**

**Section 1.**  **Term of License.**  The term of this License shall be for five (5) years commencing _____March,15_____, 20<u>21</u> and terminate five (5) years from the date of commencement of this License (the "**Term**"), subject, however, to earlier termination, with or without cause, by either party upon thirty (30) days prior written notice to the other party and further subject to prior termination as provided herein.

**Section 2.**  **Fees.**

2.1  <u>Trip Fees</u>.  Except as hereinafter provided, Licensee shall pay to City the following trip fees ("**Trip Fees**") for the license rights granted herein for services rendered at Airport:

2.1.1   Vehicles shall pay the following Trip Fees according to its category as follows:

2.1.1.1  Class 1 Vehicles:  Vehicles that are Class 1 vehicles, those seating twenty-five (25) passengers or less, shall be subject to the current per Trip (defined below) Fee for Class 1 Vehicles as provided by resolution of the Board.

2.1.1.2  Class 2 Vehicles:  Vehicles that are Class 2 vehicles, those seating more than twenty-five (25), shall be subject to the current per Trip Fee for Class 2 Vehicles as provided by resolution of the Board.

2.1.2   "Trip" Defined.  "**Trip**" shall, subject to exceptions hereinafter stated, be defined as any scheduled or unscheduled departure from the lower or arrivals level of Airport's central terminal area ("**CTA**") by a vehicle of Licensee, with or without passengers.

2.1.3   City reserves the right to adjust the Trip Fees up to two times per year.  Crew transportation pickups for signatory air carriers are excluded from paying the Trip Fees.

2.2   Other Fees.  In addition to the Trip Fees set forth above, Licensee shall pay the following fees:

2.2.1.  Administrative Fee.  Licensee shall pay the current annual administrative fee ("**Administrative Fee**") as provided by resolution of the Board.   This Administrative Fee is due whether or not there has been any business activity during the reported month.

2.2.2   Other Fees.  Licensee shall also pay all other charges, penalties or fees occasioned by its operations or activities on or about Airport.

2.3   Payments.  All Trip Fees and other fees payable hereunder shall be paid to the City of Los Angeles, Department of Airports, 1 World Way, P.O. Box 92216, Los Angeles, California 90009-2216, unless and until City designates some other party or place to receive Trip Fees and other fees.  All payments shall be made in legal tender of the United States.

**Section 3.   License Rights.**

3.1   City gives Licensee, during the Term and on a non-exclusive basis, the right to transport passengers and baggage by approved motor vehicles into and out of Airport in accordance with Licensee's rights and duties under its P.U.C. charter party carrier permit, similar federal authority or LADOT authority.

3.2   This License does not include the right or privilege to operate a package express service at Airport by either picking up or delivering packages at terminals, or to operate any vehicle at Airport with a driver or agent carrying a firearm on the person or within said vehicle.

3.3   Use of Airport.  Licensee shall use Airport only in connection with its transport business of operating passenger bus, van, or limousine, or auto-for-hire services between Airport and such points as the P.U.C., USDOT or LADOT, whichever is applicable, shall duly and regularly designate through the issuance of Certificates of Convenience and Necessity or other approvals.

3.4   Right of Ingress and Egress.  City hereby grants full and free right of ingress to and egress from Airport to Licensee, its employees, passengers, guests, invitees, suppliers of materials and furnishers of service, without charge, subject to the provisions herein and City's operating rules and regulations.

3.5     Licensee shall not use sound amplifying or public address equipment at Airport unless such use and equipment are approved in writing by the executive director of LAWA or his or her authorized representative (the "**Executive Director**").

**Section 4.     Authorized Vehicle Requirements.**

4.1     Licensee shall report to the Executive Director, on forms provided for that purpose, the manufacturer, model year, vehicle type, vehicle identification number (or "VIN"), license plate number, company identification number, passenger capacity and proof of commercial registration for each of Licensee's vehicles used in its operation at Airport.

4.2     Vehicle Requirements.

4.2.2    Luxury-type, sedan style limousines shall display TCP numbers no smaller than One and One-Half (1-1/2) inches tall on the front and rear bumpers.

4.2.3    All of Licensee's vehicles seating fifteen (15) or more passengers shall:

4.2.3.1  possess identical color schemes and markings, so as to be readily identifiable as belonging to Licensee;
4.2.3.2  display TCP numbers on each side of the vehicle;
4.2.3.3  display the name of Licensee, or its fictitious business name (or "D.B.A."), on each side of the vehicle, in a type style and size so as to be readily identifiable; and
4.2.3.4  display Licensee's company fleet identification number on the rear and each side of the vehicle.

4.2.4    Licensee shall file with City a description (either photographic or otherwise) adequate to identify the color scheme and markings common to Licensee's vehicles and distinguish them visually from vehicles used by another operator.

4.3     Non-Duplication of Company Names, Logos and Color Schemes.  It is prohibited for any Licensee to do business on Airport with a name which is identical or nearly identical to the name of an existing passenger stage corporation (or "PSC") serving Airport.  It is also prohibited for any Licensee to use the logo or color schemes of any other company in a manner which may confuse the public.  The Executive Director reserves the right to deny the use of any use of any name, logo, or color scheme.

4.4     Decals and AVI Transponders.  Upon receipt of the requisite information and performance of all other conditions precedent contained in this License, the Executive Director may issue identification stickers or decals ("**Permit**" or "**Permits**") and automatic vehicle identification transponders ("**AVI Transponder**" or "**AVI Transponders**") which shall be permanently affixed as instructed to each authorized vehicle.  The Permit and AVI Transponder shall not be transferable or assignable, but both shall be returned to City if a vehicle is removed from service.  Licensee shall pay for any lost, stolen or damaged AVI Transponders.  It shall be illegal to operate and/or board passengers on the lower level of Airport without a valid and current Permit and a properly functioning AVI Transponder affixed to the authorized vehicle.  The AVI Transponder requirement may be waived for a charter vehicle not based in Southern California.

4.5     Airport Rules and Regulations Governing Authorized Vehicles.

4.5.1     During the performance of this License, Licensee agrees to comply with the Rules and Regulations of the City of Los Angeles, Department of Airports Governing the Permit Program

for the Operation of Commercial Vehicles Transporting Passengers at Los Angeles International Airport, as may be amended from time to time (the "**Airport Rules and Regulations**") which is incorporated herein by this reference.  The Airport Rules and Regulations govern Licensee's operations at Airport.  Licensee ensures that Licensee's officers, employees, agents, drivers and vehicles also comply with the Airport Rules and Regulations.  To the extent the Airport Rules and Regulations conflict with Section 4.5.2 and 4.5.3, the Airport Rules and Regulations shall govern.

4.5.2    The Airport Rules and Regulations include, but are not limited, to the following rules and regulations:

4.5.2.1  All charter vehicles shall operate all authorized vehicles in accordance with P.U.C. rules and general orders.

4.5.2.2  Licensee shall not pick up passengers at Airport or enter the CTA for the purpose of picking up passengers between the hours of 7:00 am and 12:00 a.m. without first obtaining a valid trip ticket from the charter holding lot.  Licensee shall properly display a valid trip ticket on either the dashboard or windshield of the vehicle as designated by the Executive Director while loading or meeting passengers between the hours of 7:00 a.m. and 12:00 a.m. in the CTA.

4.5.2.3  Licensee shall not stop authorized vehicles at any vehicle loading zone on the lower level of the CTA other than as designated in the Airport Rules and Regulations.

4.5.2.4  Licensees shall not park or stop any vehicle anywhere on the upper level roadway or curbs of the CTA unless actively engaged in dropping off passengers, unless at a curb specifically designated for parking by the Executive Director.

4.5.3    <u>Violations</u>.  Violations by Licensee, its officers, employees, agents, drivers or vehicles of Airport Rules and Regulations are subject to the imposition by City of any or all of the following:  oral or written warnings, suspensions of Licensee's right to operate on Airport property, and/or termination of this License and all of Licensee's rights to operate to and from Airport. Procedural matters with respect to any such violation is outlined in the Airport Rules and Regulations.

## Section 5.    <u>Records</u>.

5.1    <u>Monthly Reports</u>.  City reserves the right to require Licensee, on forms designated or approved by City, to account to City's Landside Operations Bureau on or before the tenth (10th) day of each month of the Term for all Trips operated and passengers carried both into and out of Airport during the prior calendar month.  Licensee understands that said report forms may from time to time be modified by City and hereby agrees to use the latest report forms made available for reporting its Trips and passengers.

5.2    <u>Income Statement</u>.  Upon request of the Executive Director, Licensee shall furnish City with a detailed income statement prepared at the close of Licensee's fiscal or calendar year reflecting all business transacted by Licensee from the transportation of passengers and/or baggage to or from Airport. If requested, said income statement shall be certified by Licensee's independent certified public accountant.

5.3    <u>Records Retention, Right to Inspect</u>.

5.3.1    Licensee shall at all times during the Term maintain and keep permanent books, ledgers, journals and other records wherein are kept entries accurately reflecting all gross revenue derived from the charter party carrier business transacted to or from Airport.  In addition, Licensee shall keep and maintain a daily record of all trips and the passenger counts and fares collected from each trip both to and from Airport with supporting verifiable documents showing the driver's name, actual arrival and departure trip times, registration number of vehicle, and reservation numbers.

5.3.2    City, or its duly authorized representatives, shall, at all reasonable times, have the right of access to and the right to examine and audit all records of Licensee pertaining to the operations of its business under this License (the "**Audit**").  Licensee hereby authorizes its officers, agents, and employees to disclose to City any and all information pertaining to its operations under the license rights herein granted, including all books, ledgers, journals and other records and things done or performed by Licensee in connection therewith during the Term.  Such books and records must be maintained and kept in a location within Los Angeles, Orange, Ventura or San Bernardino County by Licensee.  Licensee may elect to maintain the required records at a location outside said counties; however, in doing so, Licensee accepts responsibility for reimbursing City for all travel and incidental expenses incurred in connection with each Audit.

5.3.3    It is agreed that examinations of the books, ledgers, journals and accounts of Licensee will be conducted in accordance with generally accepted auditing standards applicable in such circumstances and that such, said examinations do not require a detailed audit of all transactions.  Testing and sampling methods may be used by City to verify reports submitted by Licensee.  Deficiencies ascertained by the use of such testing and sampling methods, by applying the percentage of error obtained from such testing and sampling to the entire period of reporting under examination will be binding upon Licensee and to that end shall be admissible in court to prove any amounts due City from Licensee.  In the event there is any net deficiency in the amount of two percent (2%) or greater of the compensation payable to City hereunder, Licensee agrees to pay City for the cost of the Audit as well as any other deficiencies, payments and liquidated damages due under this or any other provision of this License.

## ARTICLE 2.    STANDARD TERMS AND PROVISIONS

### Section 1.  <u>Limitations on Use of Airport</u>.

1.1.    Licensee shall not use the Airport, nor any portion thereof, for any purpose other than that hereinabove set forth above, without first having had and obtained the written consent of the Executive Director, which consent may be withheld in the Executive Director's sole discretion, and which written consent is approved as to form by the City Attorney.

1.2.    There is hereby reserved to City, its successors and assigns, for the use and benefit of the public, a right of flight for the passage of aircraft in the airspace above the surface of the Airport.  This public right of flight shall include the right to cause in said airspace any noise inherent in the operation of any aircraft used for navigation or flight through said airspace or landing at, taking off from, or operating on Airport. Licensee agrees not to make any claim or institute legal action against City under any theory of recovery for any interference with Licensee's use and enjoyment of the Airport which may result from noise emanating from the operation of aircraft to, from, or upon Airport.

1.3.    Licensee, by accepting this License, agrees for itself and its successors and assigns that it will not make use of the Airport in any manner which might interfere with the landing and taking off of aircraft from Airport or otherwise constitute a hazard to such operations. In the event the aforesaid covenant is breached, City reserves the right to take all action it deems necessary to cause the abatement of such interference at the expense of Licensee.

1.4.    Licensee shall conduct its operations on Airport in such manner as to reduce as much as is reasonably practicable, considering the nature and extent of said operations, any and all activities which interfere unreasonably with the use of other premises at Airport, including, but not limited to, the emanation from the Airport of noise, vibration, movements of air, fumes, and odors.

1.5.    Licensee is prohibited from installing or using any wireless workstations, access control equipment, wireless internet servers, application or system software such as transceivers, modems, or other interface units that access frequencies from 2.0 Gigahertz to 6.0 Gigahertz, inclusive, without first obtaining approval from the Executive Director.

1.6.    Licensee has no rights under this License to install or use any antennae or telecommunications equipment on the roof or exterior of any building or structure on Airport. Licensee may not license or sublicense to others the right to install or use antennae or other telecommunications equipment on Airport.

**Section 2.    <u>Liquidated Damages for Delinquent Payment</u>**.

2.1    The failure of Licensee to pay the fees and charges on time is a breach of this License for which City may terminate or take such other legal action as it deems necessary.  Licensee agrees to pay on time.

2.2    Without waiving any rights available under this License or by law, in the event of late or delinquent payments, Licensee recognizes that City will incur certain expenses, the amount of which is difficult to ascertain.  Therefore, in addition to the fees and charges owing, Licensee agrees to pay the liquidated damages set forth below to compensate City for all expenses and/or damages and loss resulting from said late or delinquent payments by Licensee.

2.3    The liquidated damages for late or delinquent payments including the administrative fee commencing with the effective date of this License shall be ten percent (10%) per annum, or that percent per annum equal to the prevailing rate on the twenty-fifth day of the month preceding the execution of this License as established by the Federal Reserve Bank of San Francisco on advances to member banks under Sections 13 and 13a of the Federal Reserve Act, plus four and one-half percent (4-1/2%) per annum, whichever is greater, on the balance of the unpaid monthly amount calculated from the date of the delinquency until the close of the business day upon which the delinquency payment is received by City.

**Section 3.  <u>Signs</u>**.  Licensee shall not, at any time, under any circumstances, install, place, or maintain any type of advertising, on the Airport.

**Section 4.  <u>Insurance</u>**.

4.1.    Licensee shall procure at its expense, and keep in effect at all times during the term of this License, the types and amounts of insurance specified on Insurance, <u>Exhibit A</u>, attached hereto and incorporated by reference herein. The specified insurance shall also, either by provisions in the policies, by endorsement form attached to such policies, include and insure City, Los Angeles World Airports ("**LAWA**"), its Board and all of City's officers, employees, and agents, their successors and assigns, as additional insureds, against the areas of risk described on Insurance, <u>Exhibit A</u>, hereof with respect to Licensee's acts or omissions in its operations, use, and occupancy of the Airport or other related functions performed by or on behalf of Licensee in, on or about Airport.

4.2.    Each specified insurance policy (other than workers' compensation and employers' liability and fire and extended coverages) shall contain a severability of interest (cross liability) clause which states, "It is agreed that the insurance afforded by this policy shall apply separately to each insured against whom claim is made or suit is brought except with respect to the limits of the company's liability," and a contractual endorsement which shall state, "Such insurance as is afforded by this policy shall also apply to liability assumed by the insured under this License with the City of Los Angeles."

4.3.    All such insurance shall be primary and noncontributing with any other insurance held by LAWA where liability arises out of or results from the acts or omissions of Licensee, its agents, employees, officers, assigns, or any person or entity acting for or on behalf of Licensee. Such policies may provide for reasonable deductibles and/or retentions acceptable to the Executive Director based upon the nature of Licensee's operations and the type of insurance involved.

4.4.    City shall have no liability for any premiums charged for such coverage(s). The inclusion of City, LAWA, Board and all of City's officers, employees, and agents, their successors and assigns, as insureds is not intended to, and shall not, make them, or any of them, a partner or joint venturer with Licensee in Licensee's operations at Airport. In the event Licensee fails to furnish City evidence of insurance and maintain the insurance as required, City, upon ten (10) days prior written notice to comply, may (but shall not be required to) procure such insurance at the cost and expense of Licensee, and Licensee agrees to promptly reimburse City for the cost thereof plus fifteen percent (15%) for administrative overhead. Payment shall be made within thirty (30) days of invoice date.

4.5.    At least ten (10) days prior to the expiration date of the above policies, documentation showing that the insurance coverage has been renewed or extended shall be filed with City. If such coverage is canceled or reduced, Licensee shall, within fifteen (15) days of such cancellation of coverage, file with City evidence that the required insurance has been reinstated or provided through another insurance company or companies.

4.6.    Licensee shall provide proof of all specified insurance and related requirements to City by production of the actual insurance policy(ies), by use of endorsement form(s), by broker's letter acceptable to the Executive Director in both form and content in the case of foreign insurance syndicates, or by other written evidence of insurance acceptable to the Executive Director. The documents evidencing all specified coverages shall be filed with City in duplicate and shall be procured and approved in strict accordance with the provisions in Sections 11.47 through 11.56 of Los Angeles Administrative Code (the "**Code**") prior to Licensee's use of Airport.  The documents shall contain the applicable policy number, the inclusive dates of policy coverages, and the insurance carrier's name, shall bear an original signature of an authorized representative of said carrier, and shall provide that such insurance shall not be subject to cancellation, reduction in coverage, or nonrenewal except after written notice by certified mail, return receipt requested, to the City Attorney of the City of Los Angeles at least thirty (30) days prior to the effective date thereof. City reserves the right to have submitted to it, upon request, all pertinent information about the agent and carrier providing such insurance.

4.7.    City and Licensee agree that the insurance policy limits specified herein shall be reviewed for adequacy annually throughout the Term by the Executive Director who may, thereafter, require Licensee, on thirty (30) days prior, written notice, to adjust the amounts of insurance coverage to whatever reasonable amount said Executive Director deems to be adequate.

4.8.    Submission of insurance from a non-California admitted carrier is subject to the provisions of California Insurance Code Sections 1760 through 1780, and any other regulations and/or directives from the State Department of Insurance or other regulatory board or agency. Licensee agrees, except where exempted, to provide City proof of said insurance by and through a surplus lines broker licensed by the State of California.

**Section 5.  City Held Harmless**.

5.1      In addition to the requirements of Section 4, Insurance herein, Licensee shall, to the fullest extent permitted by law, defend, indemnify and hold harmless City and any and all of its boards, commissioners, officers, directors, agents, employees, assigns and successors in interest (collectively "City Defendants") from and against any and all allegations, suits, claims, causes of action, liability, losses, damages, demands or expenses (including, but not limited to, attorney's fees and costs of litigation) (collectively "Claims"), prosecuted by anyone (including Licensee and/or Licensee's agents, former and current employees, or competitors) by reason of, arising out of, related to, connected with or pertaining to (1) injury to, or death of, any person(s) (including Licensee and/or Licensee's agents or employees), or (2) damage to, or destruction of, any property (including property of Licensee and/or Licensee's agents or employees), or (3) Licensee's (and/or its employees' or agents') and/or Sublicensee's (and/or its employees' or agents') performance of the Contract, or (4) City's selection of Licensee over its competitors as the awardee of this License; whether or not contributed to by any act or omission of City, or of any of City's Boards, officers, agents or employees.  If applicable, (a) where such Claims arise from or relate to Licensee's performance of a "Construction Contract" as defined by California Civil Code Section 2783, this paragraph shall not be construed to require Licensee to indemnify or hold City harmless to the extent such Claims are caused by the City's sole negligence, willful misconduct or active negligence; and/or (b) where such Claims arise from Licensee's design professional services as defined by California Civil Code Section 2782.8, Licensee's indemnity obligations shall be limited to Claims arising out of, pertaining to, or relating to the Licensee's negligence, recklessness or willful misconduct in the performance of the Contract.

5.2      In Licensee's defense of the City, including but not limited to the negotiation, compromise, and settlement of any action, the City shall retain discretion in and control of the litigation, negotiation, compromise, settlement, and appeals there from, as required by the Los Angeles City Charter, particularly Article II, Sections 271, 272 and 273 thereof.

5.3      Survival of Indemnities.  The provisions under this Section 5 shall survive the termination of this License.  Rights and remedies available to the City hereinabove shall survive the termination of this License.  Further, the rights and remedies are cumulative of those provided for elsewhere in this License and those allowed under the laws of the United States, the State of California, and the City of Los Angeles.

**Section 6.  Attorney's Fees**.  If City is made a party to any litigation commenced by or against Licensee arising out of Licensee's use or occupancy of Airport, then Licensee shall pay all costs, expenses, and reasonable attorney's fees incurred by or imposed upon City in connection with such litigation. Each party shall give prompt notice to the other of any claim or suit instituted against it that may affect the other party.

**Section 7.  Restrictions and Regulations**

7.1      Licensee agrees to abide by any and all:  (i) applicable rules, regulations, orders and restrictions which are now in force or which may be hereafter adopted by City with respect to the operations of Airport; (ii) orders, directives or conditions issued, given or imposed by Executive Director with respect to the use of roadways, driveways, curbs, sidewalks and parking areas in and about said Airport; (iii) applicable laws, ordinances, statutes, rules, regulations or orders of any governmental authority, federal, state or municipal, lawfully exercising jurisdiction over the Airport or Licensee's occupation or use of Airport; and (iv) applicable rules and regulations of City related to commercial passenger vehicles operating at Airport.

7.2     Nothing herein contained shall be deemed to impair Licensee's right to contest any such rules, regulations, orders, restrictions, directives or conditions or the reasonableness thereof. City shall not be liable to Licensee for any damage to, or for any diminution or deprivation of, Licensee's rights hereunder on account of the exercise of any such authority, or as may arise from Airport development or operation during the term of this License, unless the exercise thereof shall so interfere with Licensee's operations herein created as to constitute a termination, in whole or in part, of this License Agreement by operation of law.

7.3     Subject to this section, Licensee, its employees, agents and representatives shall not in any manner pay, extend or give any type of consideration, compensation, gratuity or reward to any Airport skycap, porter, starter, ticket or information booth person at Airport, or other curbside or terminal personnel at Airport, unless the latter be a uniformed employee of Licensee for which workers' compensation benefits are paid by Licensee and whose presence and activities on Airport property are approved by the Executive Director.

7.4     City reserves the right to require Licensee's vehicles to stop at designated locations or use designated entry or departure routes so that City may inspect or count said vehicles and determine passenger loads.

7.5     The Executive Director is authorized to establish and construct a staging area for commercial vehicles providing ground transportation services. The Executive Director is authorized to require that all vehicles not actively loading or unloading passengers park in a City staging area. The Executive Director reserves the right to charge a fee for use of such staging area. Use of the staging area shall be limited to such times as the Executive Director may allow.

7.6     Nothing in this License shall be construed as authorizing Licensee to place starters, skycaps, porters, booth personnel, agents, or other personnel on the curbs or sidewalks or in the terminals at Airport without first having obtained the written consent of Executive Director.

7.7     Licensee agrees to operate its vehicles at Airport only when a current and valid Airport decal or sticker has been permanently affixed to the vehicle in the appropriate location. Failure to have a current and valid decal affixed on a vehicle while operating on Airport premises shall mean that Licensee does not have City approval to operate said vehicle on Airport. Licensee understands that under said circumstances the driver of the vehicle is subject to citation, the vehicle is subject to impound, and Licensee may receive a suspension or termination of operating rights on Airport. City reserves the right to determine the frequency of and occasions when new or replacement decals or stickers may be issued.

7.8     Licensee shall be solely responsible for any and all civil and/or criminal penalties assessed as a result of its failure to comply with any of these rules, regulations, restrictions, ordinances, statutes, laws, orders, directives and/or conditions.

### Section 8.   Assignments and Encumbrances.

8.1     Licensee shall not, in any manner, directly or indirectly, by operation of law or otherwise, assign, transfer or encumber this License, or any portion thereof or any interest therein, nor shall Licensee license or otherwise authorize the use of, in whole or in part, the rights granted by this License, without the prior written consent of the Board. Any attempts to assign, transfer or encumber this License, or any licensing or authorizing the use of, in whole or in part, the rights granted by this License, shall be void and shall confer no right, title or interest in or to this License, upon any such assignee, transferee, or encumbrancer. Consent to one assignment, transfer, or encumbrance shall not be deemed to be a consent to any subsequent assignment, transfer or encumbrance. This License shall not, nor shall any interest

therein, be assignable as to the interest of Licensee by operation of law without the prior written consent of Board.

8.2     When proper consent has been given by the Board, the provisions of this License shall be binding upon, and shall inure to the benefit of, the heir(s), successor(s), executor(s), administrator(s) and assign(s) of the parties hereto.

**Section 9.     Nondiscrimination and Equal Employment Practices/Affirmative Action Program.**

9.1. Federal **Non-Discrimination Provisions**.

9.1.1.  The Licensee for itself, its heirs, personal representatives, successors in interest, and assigns, as a part of the consideration hereof, does hereby covenant and agree that in the event facilities are constructed, maintained, or otherwise operated on said property described in this License, for a purpose for which a Department of Transportation program or activity is extended or for another purpose involving the provision of similar services or benefits, the Licensee shall maintain and operate such facilities and services in compliance with all other requirements imposed pursuant to 49 CFR Part 21, Nondiscrimination in Federally Assisted Programs of the Department of Transportation, and as said Regulations may be amended.

9.1.2.  The Licensee does hereby covenant that: (1) no person on the grounds of race, color or national origin shall be excluded from participation in, denied the benefits of, or be otherwise subjected to discrimination in the use of said facilities, (2) that in the construction of any improvements on, over, or under such land and the furnishing of services thereon, no person on the grounds of race, color, or national origin shall be excluded from participation in, denied the benefits of, or otherwise be subjected to discrimination, (3) that the Licensee shall use the Airport in compliance with all other requirements imposed by or pursuant to 49 CFR Part 21, Nondiscrimination in Federally Assisted Programs of the Department of Transportation, and as said Regulations may be amended.

9.1.3.  The Licensee assures that it will comply with pertinent statutes, Executive Orders, and such rules as are promulgated to assure that no person shall, on the grounds of race, creed, color, national origin, sex, age, or handicap be excluded from participating in any activity conducted with or benefiting from Federal assistance. This provision obligates the Licensee or its transferee for the period during which Federal assistance is extended to the airport program, except where Federal assistance is to provide, or is in the form of personal property or real property or interest therein or structures or improvements thereon.  In these cases, the provision obligates the party or any transferee for the longer of the following periods:  (a) the period during which the property is used by the sponsor or any transferee for a purpose for which Federal assistance is extended, or for another purpose involving the provision of similar services or benefits; or (b) the period during which the airport sponsor or any transferee retains ownership or possession of the property.

9.1.4. Licensee shall furnish its services on a reasonable and not unjustly discriminatory basis to all users, and charge reasonable and not unjustly discriminatory prices for each unit or service, provided that Licensee may be allowed to make reasonable and nondiscriminatory discounts, rebates, or other similar types of price reductions to volume purchasers.

9.1.5. Licensee agrees that it shall insert the provisions found in subsections 9.1.3 and 9.1.4 above in any assignment, license, transfer or sublicense by which said Licensee grants a right or

privilege to any person, firm, or corporation to render accommodations and/or services to the public on the Airport.

9.2.    **Municipal Non-Discrimination Provisions.**

9.2.1. **Non-Discrimination In Use Of Airport**.  There shall be no discrimination against or segregation of any person, or group of persons, on account of race, religion, national origin, ancestry, sex, sexual orientation, age, physical handicap, marital status, domestic partner status, or medical condition in the License, transfer, use, occupancy, tenure, or enjoyment of the Airport or any operations or activities conducted on the Airport.  Nor shall Licensee or any person claiming under or through Licensee establish or permit any such practice or practices of discrimination or segregation with reference to the selection, location, number, use or occupancy of tenants, subtenants, or vendees of the Airport.  Any assignment or transfer which may be permitted under this License shall also be subject to all non-discrimination clauses contained in Article 2, Section 9.2.

9.2.2. **Non-Discrimination In Employment**.  During the Term, Licensee agrees and obligates itself in the performance of this License not to discriminate against any employee or applicant for employment because of the employee's or applicant's race, religion, national origin, ancestry, sex, sexual orientation, age, physical handicap, marital status, domestic partner status, or medical condition.  Licensee shall take affirmative action to insure that applicants for employment are treated, during the term of this License, without regard to the aforementioned factors and shall comply with the affirmative action requirements of the Code, Sections 10.8, et seq., or any successor ordinances or law concerned with discrimination.

9.2.3. Equal Employment Practices.  If the total payments made to City under this lease are One Thousand Dollars ($1,000) or more, this provision shall apply.  During the performance of this License, Licensee agrees to comply with Section 10.8.3 of the Los Angeles Administrative Code ("Equal Employment Practices"), which is incorporated herein by this reference.  A copy of Section 10.8.3 has been attached to this License for the convenience of the parties as Exhibit B.  By way of specification but not limitation, pursuant to Sections 10.8.3.E and 10.8.3.F of the Los Angeles Administrative Code, the failure of Licensee to comply with the Equal Employment Practices provisions of this License may be deemed to be a material breach of this License. No such finding shall be made or penalties assessed except upon a full and fair hearing after notice and an opportunity to be heard has been given to Licensee.  Upon a finding duly made that Licensee has failed to comply with the Equal Employment Practices provisions of this License, this License may be forthwith terminated, cancelled, or suspended.

9.2.4. Affirmative **Action Program**.  If the total payments made under this License are One Hundred Thousand Dollars ($100,000) or more, this provision shall apply.  During the performance of this License, Licensee agrees to comply with Section 10.8.4 of the Los Angeles Administrative Code ("**Affirmative Action Program**"), which is incorporated herein by this reference. A copy of Section 10.8.4 has been attached to this License for the convenience of the parties as Exhibit C.  By way of specification but not limitation, pursuant to Sections 10.8.4.E and 10.8.4.F of the Code, the failure of Licensee to comply with the Affirmative Action Program provisions of this License may be deemed to be a material breach of this License.  No such finding shall be made or penalties assessed except upon a full and fair hearing after notice and an opportunity to be heard has been given to Licensee.  Upon a finding duly made that Licensee has failed to comply with the Affirmative Action Program provisions of this License, this License may be forthwith terminated, cancelled or suspended.

**Section 10.  <u>Taxes, Fees and Licenses</u>**.

10.1     Licensee shall pay all taxes of whatever character that may be levied or charged upon Licensee's operations at the Airport, or upon Licensee's improvements, fixtures, equipment, or other property on the Airport, or upon Licensee's use thereof.

10.2   Licensee shall also pay for, and cause to be maintained in full force and effect during the term of this License, all licenses or permits necessary or required by law or regulation for the conduct and operation of Licensee's business authorized herein, or for use of Airport.  Such licenses and permits shall cover not only Licensee, but also all of Licensee's employees and agents required to be licensed to transact Licensee's business at the Airport.

10.3     If a claim is made against City for any of the above charges, City shall notify Licensee in writing and Licensee shall promptly pay said charges; provided, however, that failure by City to give such notice shall not constitute a waiver of Licensee's obligation to pay such taxes, license and/or permit fees.

10.4     The obligations of Licensee under this section, however, shall not prevent Licensee from contesting the validity and/or applicability of any of the above charges and, during the period of any such lawful contest, Licensee may refrain from making, or direct the withholding of, any such payment without being in breach of the above provisions.  Upon a final determination in which Licensee is held responsible for such taxes and/or fees, Licensee shall promptly pay the required amount, plus all legally imposed interest, penalties and surcharges.  If all or any part of such taxes and/or fees, penalties, or surcharges are refunded to City, City shall remit to Licensee such sums to which Licensee is legally entitled.

**Section 11.  <u>Disabled Access</u>**.

11.1     Licensee shall be solely responsible for fully complying with any and all applicable present and/future rules, regulations, restrictions, ordinances, statutes, laws, and/or orders of any federal, state, and/or local governmental entity and/or court regarding disabled access, including any services, programs, improvements or activities provided by Licensee.  Licensee shall be solely responsible for any and all damages caused by, and/or penalties levied as the result of, Licensee's noncompliance.  Further, Licensee agrees to cooperate fully with City in its efforts to comply with the Americans with Disabilities Act of 1990 and any amendments thereto, or successor statutes.

11.2     Should Licensee fail to comply with Subsection 11.1, then City shall have the right, but not the obligation, to perform, or have performed, whatever work is necessary to achieve equal access compliance.  Licensee will then be required to reimburse City for the actual cost of achieving compliance, plus a fifteen percent (15%) administrative charge.

**Section 12.     <u>Child Support Orders</u>**.
This License is subject to Section 10.10, Article I, Chapter 1, Division 10 of the Los Angeles Administrative Code related to Child Support Assignment Orders, which is incorporated herein by this reference.  A copy of Section 10.10 has been attached hereto for the convenience of the parties on <u>Exhibit D</u>.  Pursuant to this Section, Licensee (and any subcontractor of Licensee providing services at City under this License) shall (1) fully comply with all State and Federal employment reporting requirements for Licensee's or Licensee's subcontractor's employees applicable to Child Support Assignments Orders; (2) fully comply with all lawfully served Wage and Earnings Assignment Orders and Notices of Assignment in accordance with California Family Code Section 5230, et seq.; and (3) maintain such compliance throughout the term of this License.  Pursuant to Section 10.10(b) of the Los Angeles Administrative Code, failure of Licensee or an applicable subcontractor to comply with all applicable reporting

requirements or to implement lawfully served Wage and Earnings Assignment Orders and Notices of Assignment or the failure of any principal owner(s) of Licensee or applicable subcontractors to comply with any Wage and Earnings Assignment Orders and Notices of Assignment applicable to them personally shall constitute a default of this License subjecting this License to termination where such failure shall continue for more than ninety (90) days after notice of such failure to Licensee by City (in lieu of any time for cure provided elsewhere in this License).

**Section 13.** **Alternative Fuel Vehicle Requirement Program.** Licensee shall comply with the provisions of the alternative fuel vehicle requirement program (the "**Alternative Fuel Vehicle Requirement Program**"), if applicable. The rules, regulations and requirements of the Alternative Fuel Vehicle Requirement Program are attached as Exhibit E and made a material term of this License.

**Section 14.** **Waiver**. The waiver by either party of any breach of any term, covenant, or condition herein contained shall not be deemed to be a waiver of any other term, covenant, or condition, or of any subsequent breach of the same term, covenant, or condition. The subsequent acceptance of compensation hereunder by City shall not be deemed to be a waiver of any preceding breach by Licensee of any term, covenant, or condition of this License other than the failure of Licensee to pay the particular compensation so accepted, regardless of City's knowledge of such preceding breach at the time of acceptance of such compensation.

**Section 15.** **City's Right to Contract With Others Regarding License Rights.** The rights granted hereunder by this License are not exclusive in nature, and City specifically reserves the right to enter into similar additional license agreements at Airport, at any time.

**Section 16.** **Business Tax Registration**. Licensee represents that it has registered its business with the Office of Finance of the City of Los Angeles and has obtained and presently holds from that office a Business Tax Registration Certificate, or a Business Tax Exemption Number, required by City's Business Tax Ordinance (Article 1, Chapter 2, Sections 21.00 and following, of City's Municipal Code). Licensee shall maintain, or obtain as necessary, all such certificates required of it under said ordinance and shall not allow any such certificate to be revoked or suspended during the term hereof.

**Section 17.** **Default and Right of Termination**.

17.1    In the event Licensee fails to abide by the terms, covenants and conditions of this License, including any default in the payment by Licensee of the fees provided for herein, City may give Licensee written notice to correct the defect or default and if the same is not corrected, or substantial steps are not taken toward accomplishing such correction, within ten (10) days after City's mailing such notification, City may terminate this License forthwith. City's election to terminate shall not be construed as a waiver of any claim city may have against the Licensee, consistent with such termination.

17.2    In case of the bankruptcy of Licensee, or the appointment of a receiver for Licensee, or if a receiver is appointed to take possession of Licensee's business operations as a result of any act or omission of Licensee, or if Licensee makes an assignment of this License for the benefit of creditors, City, at its election, may, without notice, terminate this License.

17.3    A material default or breach of the terms of any other lease, license, permit, or contract held by Licensee with City shall constitute a material breach of the terms of this License and shall give City the right to terminate this License for cause in accordance with the procedures set forth herein.

**Section 18.** **Miscellaneous Provisions.**

18.1. **Fair Meaning**. The language of this License shall be construed according to its fair meaning, and not strictly for or against either City or Licensee.

18.2. **Section Headings**. The section headings appearing herein are for the convenience of City and Licensee, and shall not be deemed to govern, limit, modify, or in any manner affect the scope, meaning, or intent of the provisions of this License.

18.3. **Void Provisions**. If any provision of this License is determined to be void by any court of competent jurisdiction, then such determination shall not affect any other provision of this License, and all such other provisions shall remain in full force and effect.

18.4. **Two Constructions**. It is the intention of the parties hereto that if any provision of this License is capable of two constructions, one of which would render the provision void and the other of which would render the provision valid, then the provision shall have the meaning which renders it valid.

18.5. **Laws of California**. This License shall be construed and enforced in accordance with the laws of the State of California and venue shall lie at Airport.

18.6. **Gender**. The use of any gender herein shall include all genders, and the use of any number shall be construed as the singular or the plural, all as the context may require.

18.7. **Exclusivity**. It is understood and agreed that nothing herein contained shall be construed to grant or authorize the granting of an exclusive right within the meaning of 49 U.S.C. 40103(e).

18.8. **Rights of United States Government**. This License shall be subordinate to the provisions and requirements of any existing or future agreement between City and the United States relative to the development, operation, or maintenance of Airport.

18.9. **War or National Emergency**. This License and all the provisions hereof shall be subject to whatever right the United States Government now has or in the future may have or acquire affecting the control, operation, regulation, and taking over of Airport or the exclusive or nonexclusive use of Airport by the United States during the time of war or national emergency.

18.10. **Time**. Time shall be of the essence in complying with the terms, conditions, and provisions of this License.

18.11. **Integration Clause**. It is understood that no alteration or variation of the terms of this License shall be valid unless made in writing and signed by the parties hereto, and that no oral understanding or agreement, not incorporated herein in writing, shall be binding on any of the parties hereto.

18.12. **Approvals**. Any approvals required by City under this License shall be approvals of LAWA acting as Licensor and shall not relate to, constitute a waiver of, supersede or otherwise limit or affect the governmental approvals or rights of City as a governmental agency, including the approval of any permits required for construction or maintenance on Airport and the passage of any laws including those relating to zoning, land use, building and safety.

18.13. **Conflicts in this License**. If there are any direct conflicts between the provisions of Article 1 and Article 2 of the License, the provisions of Article 1 shall be controlling.

18.14. **Ordinance and Code Language Governs**. Ordinances issued by the City of Los Angeles ("**Ordinance**") and Code Exhibits are provided as a convenience to the parties only. In the event of a

*LAX – Charter Transportation NELA*                                                    *Reso.15959*
*MLM - #263272/ NAK 3-10-15 revised*

discrepancy between the Exhibits and the applicable ordinance and/or code language, or amendments thereto, the language of the ordinance and/or code shall govern.

18.15 **Amendments to Ordinances and Codes**.  The obligation to comply with any Ordinances and Codes which have been incorporated into this License by reference, shall extend to any amendments which may be made to those Ordinances and Codes during the term of this License.

18.16. **Days**.  Unless otherwise specified, "days" shall mean calendar days.

18.17. **Deprivation of Licensee's Rights**.  City shall not be liable to Licensee for any diminution or deprivation of Licensee's rights under this License which may result from Licensee's obligation to comply with any and all applicable laws, rules, regulations, restrictions, ordinances, statutes, and/or orders of any federal, state and/or local government authority and/or court hereunder on account of the exercise of any such authority as is provided in this Subsection, nor shall Licensee be entitled to terminate the whole or any portion of the License by reason thereof.

**Section 19.    Notices.**

19.1    Any notice or other communication required or permitted to be given, rendered or made by either party to the other, by any provision of this License or by any applicable law or requirement of public authority, shall (unless otherwise expressly set forth herein) be in writing and shall be deemed to have been properly given, rendered or made, if given by registered or certified mail, postage prepaid, and addressed as follows:

If to City:

Executive Director of the Department of Airports
c/o LAX Airport Permit Services
1 World Way
Post Office Box 92216
Los Angeles, California 90009-2216

with a copy to:

Department of Airports
Attn: City Attorney
1 World Way
Post Office Box 92216
Los Angeles, California 90009-2216

If to Licensee:

Skyhop Global Llc
Attn: Ms. Kristine Scotto
1170 Lee Wagener Blvd
Ste 203
Fort Lauderdale, FL 33315

or to such other address as one party may designate by written notice to the other party.

19.2     The execution of a notice by the Executive Director shall be as effective as to Licensee as if it were executed by Board or by Resolution or Order of said Board, and Licensee shall not question the authority of the Executive Director to execute any such notice.

19.3     All notices shall be effective upon receipt.

IN WITNESS WHEREOF, City has caused this License to be executed by the Executive Director and Licensee has caused the same to be executed by its duly authorized officers and its corporate seal to be hereunto affixed,[1] all as of the day and year first hereinabove written.

**Skyhop Global Llc**

ATTEST:

Date: 3/15/2021 _____

By: _____ *Ms. kristine Scotto*
B5A55548A1884D9...

_____
Kristine Scotto
Full Name
Secretary
Title

Date: 3/15/2021 _____

By: _____ *Ms. kristine Scotto*
B5A55548A1884D9...

_____
Kristine Scotto
Full Name
Chief Executive Officer
Title

[1]If Licensee is a partnership, a general partner should sign.  If Licensee is a sole proprietorship or non-corporate business, an owner should sign.

APPROVED AS TO FORM:

Date: 3/15/2021 _____

By: _____ *Nichole A. kelso*
DE0B1E7CB23848C...

_____
Nichole Kelso, City Attorney
Full Name

_____
Deputy/Assistant City Attorney
Title

CITY OF LOS ANGELES

Date: 3/16/2021 _____

By: _____ *David Reich*
BB610A6AEB2B437...

_____
David Reich
Full Name

_____
Executive Director, Department of Airports
Title

**INSURANCE REQUIREMENTS FOR LOS ANGELES WORLD AIRPORTS**

_____

**EXHIBIT A**
**INSURANCE**

Page 1

DocuSign Envelope ID: 95402137-3843-4F69-B034-1EC4BCCD834D

NAME:
AGREEMENT / ACTIVITY:  **Charter Party Carrier (TCP) and Passenger Stage Corporation (PSC)
Commercial Ground Transportation Non-Exclusive License Agreement**
TERM:
LAWA DIVISION:

The insured must maintain insurance coverage at limits normally required of its type operation; however, the following coverage noted with an "X" is the minimum required and must be at least the level of the limits indicated. All limits are per occurrence unless otherwise specified.

**LIMITS**

**(X)** Workers' Compensation (Statutory)/Employer's Liability                     **Statutory**
     (**X**) Voluntary Compensation Endorsement
     (**X**) Waiver of Subrogation, specifically naming LAWA
          (Please see attached supplement – Required for Bus Operators only)

**(X)** Commercial Automobile Liability - covering owned, non-owned & hired auto
     Any vehicle with 7 passengers or less                          **$750,000 CSL**
     Any vehicle with 8 through 15 passengers                       **$1,500,000 CSL**
     Any vehicle with 16 passengers or more                         **$5,000,000CSL**

**CONTRACTOR SHALL BE HELD RESPONSIBLE FOR OWN OR HIRED EQUIPMENT AND SHALL HOLD AIRPORT HARMLESS FROM LOSS, DAMAGE OR DESTRUCTION TO SUCH EQUIPMENT.**

**INSURANCE COMPANIES WHICH DO NOT HAVE AN AMBEST RATING OF A- OR BETTER, AND HAVE A MINIMUM FINANCIAL SIZE OF AT LEAST 4, MUST BE REVIEWED FOR ACCEPTABILITY BY RISK MANAGEMENT.**

**PLEASE RETURN THIS FORM WITH EVIDENCE OF INSURANCE**

**EXHIBIT A**
**INSURANCE**

Page 2

## INSURANCE REQUIREMENTS FOR LOS ANGELES WORLD AIRPORTS
## (SUPPLEMENT)

The **only** evidence of insurance accepted will be either a Certificate of Insurance and/or a True and Certified copy of the policy. The following items must accompany the form of evidence provided:

- **Endorsements:**

  1. Workers Compensation Waiver of Subrogation Endorsement
     - WC 04 03 06 or similar

  ****All endorsements must specifically name in the schedule:

  **The City of Los Angeles, Los Angeles World Airports, its Board, and all of its officers, employees and agents.**

  **A BLANKET/AUTOMATIC ENDORSEMENT AND/OR LANGUAGE ON A CERTIFICATE OF INSURANCE IS NOT ACCEPTABLE.**

- A typed legible name of the Authorized Representative must accompany the signature on the Certificate of Insurance and/or the True and Certified copy of the policy.

- Certificate Holder:

  Los Angeles World Airports
  PO Box 92216
  Los Angeles, CA 90009

## EXHIBIT A
### INSURANCE

# LOS ANGELES ADMINISTRATIVE CODE
## Div. 10, Ch. l, Art. l

## EQUAL EMPLOYMENT

**Sec. 10.8.3. Equal Employment Practices Provisions.**

Every non-construction contract with or on behalf of the City of Los Angeles for which the consideration is $1,000 or more, and every construction contract for which the consideration is $1,000 or more, shall contain the following provisions, which shall be designated as the **EQUAL EMPLOYMENT PRACTICES** provision of such contract:

A. During the performance of this contract, the contractor agrees and represents that it will provide equal employment practices and the contractor and each subcontractor hereunder will ensure that in his or her employment practices persons are employed and employees are treated equally and without regard to or because of race, religion, ancestry, national origin, sex, sexual orientation, age, disability, marital status or medical condition.

1. This provision applies to work or service performed or materials manufactured or assembled in the United States.
2. Nothing in this section shall require or prohibit the establishment of new classifications of employees in any given craft, work or service category.
3. The contractor agrees to post a copy of Paragraph A hereof in conspicuous places at its place of business available to employees and applicants for employment.

B. The contractor will, in all solicitations or advertisements for employees placed by or on behalf of the contractor, state that all qualified applicants will receive consideration for employment without regard to their race, religion, ancestry, national origin, sex, sexual orientation, age, disability, marital status or medical condition.

C. As part of the City's supplier registration process, and/or at the request of the awarding authority, or the Board of Public Works, Office of Contract Compliance, the contractor shall certify in the specified format that he or she has not discriminated in the performance of City contracts against any employee or applicant for employment on the basis or because of race, religion, national origin, ancestry, sex, sexual orientation, age, disability, marital status or medical condition.

D. The contractor shall permit access to and may be required to provide certified copies of all of his or her records pertaining to employment and to employment practices by the awarding authority or the Office of Contract Compliance for the purpose of investigation to ascertain compliance with the Equal Employment Practices provisions of City contracts. On their or either of their request the contractor shall provide evidence that he or she has or will comply therewith.

E. The failure of any contractor to comply with the Equal Employment Practices provisions of this contract may be deemed to be a material breach of City contracts. Such failure shall only be established upon a finding to that effect by the awarding authority, on the basis of its own investigation or that of the Board of Public Works, Office of Contract Compliance. No such finding shall be made or penalties assessed except upon a full and fair hearing after notice and an opportunity to be heard has been given to the contractor.

F. Upon a finding duly made that the contractor has failed to comply with the Equal Employment Practices provisions of a City contract, the contract may be forthwith canceled, terminated or suspended, in whole or in part, by the awarding authority, and all monies due or to become due hereunder may be forwarded to and retained by the City of Los Angeles. In addition thereto, such failure to comply may be the basis for a determination by the awarding authority or the Board of Public Works that the said contractor is an irresponsible bidder or proposer pursuant to the provisions of Section 371 of the Charter of the City of Los Angeles. In the event of such a determination, such contractor shall be disqualified from being awarded a contract with the City of Los Angeles for a period of two years, or until the contractor shall establish and carry out a program in conformance with the provisions hereof.

G. Notwithstanding any other provision of this contract, the City of Los Angeles shall have any

## EXHIBIT B
### EQUAL EMPLOYMENT

Page 1

and all other remedies at law or in equity for any breach hereof.

H. The Board of Public Works shall promulgate rules and regulations through the Office of Contract Compliance, and provide necessary forms and required language to the awarding authorities to be included in City Request for Bids or Request for Proposal packages or in supplier registration requirements for the implementation of the Equal Employment Practices provisions of this contract, and such rules and regulations and forms shall, so far as practicable, be similar to those adopted in applicable Federal Executive orders. No other rules, regulations or forms may be used by an awarding authority of the City to accomplish the contract compliance program.

I. Nothing contained in this contract shall be construed in any manner so as to require or permit any act which is prohibited by law.

J. At the time a supplier registers to do business with the City, or when an individual bid or proposal is submitted, the contractor shall agree to adhere to the Equal Employment Practices specified herein during the performance or conduct of City Contracts.

K. Equal Employment Practices shall, without limitation as to the subject or nature of employment activity, be concerned with such employment practices as:

1. Hiring practices;
2. Apprenticeships where such approved programs are functioning, and other on-the-job training for non-apprenticeable occupations;
3. Training and promotional opportunities; and
4. Reasonable accommodations for persons with disabilities.

L. All contractors subject to the provisions of this section shall include a like provision in all subcontracts awarded for work to be performed under the contract with the City and shall impose the same obligations, including but not limited to filing and reporting obligations, on the subcontractors as are applicable to the contractor. Failure of the contractor to comply with this requirement or to obtain the compliance of its subcontractors with all such obligations shall subject the contractor to the imposition of any and all sanctions allowed by law, including but not limited to termination of the contractor's contract with the City.

**SECTION HISTORY**

*Amended by: Ord. No.147,030, Eff. 4-28-75; Paragraphs A., B., C., Ord. No. 164,516, Eff. 4-13-89; Paragraphs C., Ord. No.168,244, Eff. 10-18-92; Ord. No. 173,186, Eff. 5-22-00; Subsec. F., Ord. No.173,285, Eff. 6-26-00, Oper. 7-1-00.*

# EXHIBIT B
## EQUAL EMPLOYMENT

# LOS ANGELES ADMINISTRATIVE CODE

## Div. 10, Ch. 1, Art. 1

### AFFIRMATIVE ACTION

**Sec. 10.8.4. Affirmative Action Program Provisions.**

Every non-construction contract with or on behalf of the City of Los Angeles for which the consideration is $100,000 or more and every construction contract with or on behalf of the City of Los Angeles for which the consideration is $5,000 or more shall contain the following provisions which shall be designated as the **AFFIRMATIVE ACTION PROGRAM** provisions of such contract:

A.  During the performance of a City contract, the contractor certifies and represents that the contractor and each subcontractor hereunder will adhere to an affirmative action program to ensure that in its employment practices, persons are employed and employees are treated equally and without regard to or because of race, religion, ancestry, national origin, sex, sexual orientation, age, disability, marital status or medical condition.

1. This provision applies to work or services performed or materials manufactured or assembled in the United States.
2. Nothing in this section shall require or prohibit the establishment of new classifications of employees in any given craft, work or service category.

3. The contractor shall post a copy of Paragraph A hereof in conspicuous places at its place of business available to employees and applicants for employment.

B.  The contractor will, in all solicitations or advertisements for employees placed by or on behalf of the contractor, state that all qualified applicants will receive consideration for employment without regard to their race, religion, ancestry, national origin, sex, sexual orientation, age, disability, marital status or medical condition.

C.  As part of the City's supplier registration process, and/or at the request of the awarding authority or the Office of Contract Compliance, the contractor shall certify on an electronic or hard copy form to be supplied, that the contractor has not discriminated in the performance of City contracts against any employee or applicant for employment on the basis or because of race, religion, ancestry, national origin, sex, sexual orientation, age, disability, marital status or medical condition.

D.  The contractor shall permit access to and may be required to provide certified copies of all of its records pertaining to employment and to its employment practices by the awarding authority or the Office of Contract Compliance, for the purpose of investigation to ascertain compliance with the Affirmative Action Program provisions of City contracts, and on their or either of their request to provide evidence that it has or will comply therewith.

E.  The failure of any contractor to comply with the Affirmative Action Program provisions of City contracts may be deemed to be a material breach of contract.  Such failure shall only be established upon a finding to that effect by the awarding authority, on the basis of its own investigation or that of the Board of Public Works, Office of Contract Compliance.  No such finding shall be made except upon a full and fair hearing after notice and an opportunity to be heard has been given to the contractor.

F.  Upon a finding duly made that the contractor has breached the Affirmative Action Program provisions of a City contract, the contract may be forthwith cancelled, terminated or suspended, in whole or in part, by the awarding authority, and all monies due or to become due hereunder may be forwarded to and retained by the City of Los Angeles.  In addition thereto, such breach may be the basis for a determination by the awarding authority or the Board of Public Works that the said contractor is an irresponsible bidder or

**EXHIBIT C**
**AFFIRMATIVE ACTION**

Page 1

proposer pursuant to the provisions of Section 371 of the Los Angeles City Charter. In the event of such determination, such contractor shall be disqualified from being awarded a contract with the City of Los Angeles for a period of two years, or until he or she shall establish and carry out a program in conformance with the provisions hereof.

G.  In the event of a finding by the Fair Employment and Housing Commission of the State of California, or the Board of Public Works of the City of Los Angeles, or any court of competent jurisdiction, that the contractor has been guilty of a willful violation of the California Fair Employment and Housing Act, or the Affirmative Action Program provisions of a City contract, there may be deducted from the amount payable to the contractor by the City of Los Angeles under the contract, a penalty of TEN DOLLARS ($10.00) for each person for each calendar day on which such person was discriminated against in violation of the provisions of a City contract.

H.  Notwithstanding any other provisions of a City contract the City of Los Angeles shall have any and all other remedies at law or in equity for any breach hereof.

I.  The Public Works Board of Commissioners shall promulgate rules and regulations through the Office of Contract Compliance and provide to the awarding authorities electronic and hard copy forms for the implementation of the Affirmative Action Program provisions of City contracts, and rules and regulations and forms shall, so far as practicable, be similar to those adopted in applicable Federal Executive Orders. No other rules, regulations or forms may be used by an awarding authority of the City to accomplish this contract compliance program.

J.  Nothing contained in City contracts shall be construed in any manner so as to require or permit any act which is prohibited by law.

K.  The contractor shall submit an Affirmative Action Plan which shall meet the requirements of this chapter at the time it submits its bid or proposal or at the time it registers to do business with the City.  The plan shall be subject to approval by the Office of Contract Compliance prior to award of the contract.    The awarding

authority may also require contractors and suppliers to take part in a pre-registration, pre-bid, pre-proposal, or pre-award conference in order to develop, improve or implement a qualifying Affirmative Action Plan.  Affirmative Action Programs developed pursuant to this section shall be effective for a period of twelve months from the date of approval by the Office of Contract Compliance.  In case of prior submission of a plan, the contractor may submit documentation that it has an Affirmative Action Plan approved by the Office of Contract Compliance within the previous twelve months. If the approval is 30 days or less from expiration, the contractor must submit a new Plan to the Office of Contract Compliance and that Plan must be approved before the contract is awarded.

(1)  Every contract of $5,000 or more which may provide construction, demolition, renovation, conservation or major maintenance of any kind shall in addition comply with the requirements of Section 10.13 of the Los Angeles Administrative Code.

(2)  A contractor may establish and adopt as its own Affirmative Action Plan, by affixing his or her signature thereto, an Affirmative Action Plan prepared and furnished by the Office of Contract Compliance, or it may prepare and submit its own Plan for approval.

L.  The Office of Contract Compliance shall annually supply the awarding authorities of the City with a list of contractors and suppliers who have developed Affirmative Action Programs. For each contractor and supplier the Office of Contract Compliance shall state the date the approval expires.   The Office of Contract Compliance shall not withdraw its approval for any Affirmative Action Plan or change the Affirmative Action Plan after the date of contract award for the entire contract term without the mutual agreement of the awarding authority and the contractor.

M.  The Affirmative Action Plan required to be submitted hereunder and the pre-registration, pre-bid, pre-proposal or pre-award conference which may he required by the Board of Public Works, Office of Contract Compliance or the awarding authority shall, without limitation as to

## EXHIBIT C
### AFFIRMATIVE ACTION

Page 2

the subject or nature of employment activity, be concerned with such employment practices as:

1. Apprenticeship where approved programs are functioning, and other on-the-job training for non-apprenticeable occupations;

2. Classroom preparation for the job when not apprenticeable;

3. Pre-apprenticeship education and preparation;

4. Upgrading training and opportunities;

5. Encouraging the use of contractors, subcontractors and suppliers of all racial and ethnic groups, provided, however, that any contract subject to this ordinance shall require the contractor, subcontractor or supplier to provide not less than the prevailing wage, working conditions and practices generally observed in private industries in the contractor's, subcontractor's or supplier's geographical area for such work;

6. The entry of qualified women, minority and all other journeymen into the industry; and

7. The provision of needed supplies or job conditions to permit persons with disabilities to be employed, and minimize the impact of any disability.

N. Any adjustments which may be made in the contractor's or supplier's work force to achieve the requirements of the City's Affirmative Action Contract Compliance Program in purchasing and construction shall be accomplished by either an increase in the size of the work force or replacement of those employees who leave the work force by reason of resignation, retirement or death and not by termination, layoff, demotion or change in grade.

O. Affirmative Action Agreements resulting from the proposed Affirmative Action Plan or the pre-registration, pre-bid, pre-proposal or pre-award conferences shall not be confidential and may be publicized by the contractor at his or her discretion. Approved Affirmative Action Agreements become the property of the City and may be used at the discretion of the City in its Contract Compliance Affirmative Action Program.

P. This ordinance shall not confer upon the City of Los Angeles or any Agency, Board or Commission thereof any power not otherwise provided by law to determine the legality of any existing collective bargaining agreement and shall have application only to discriminatory employment practices by contractors or suppliers engaged in the performance of City contracts.

Q. All contractors subject to the provisions of this section shall include a like provision in all subcontracts awarded for work to be performed under the contract with the City and shall impose the same obligations, including but not limited to filing and reporting obligations, on the subcontractors as are applicable to the contractor. Failure of the contractor to comply with this requirement or to obtain the compliance of its subcontractors with all such obligations shall subject the contractor to the imposition of any and all sanctions allowed by law, including but not limited to termination of the contractor's contract with the City.

**SECTION HISTORY**

*Amended by Ord. No. 147,030, Eff. 4-28-75; Paragraphs A., B., C., Ord. No. 164,516, Eff. 4-13-89; Paragraphs B. and C., Ord. No. 168,244, Eff. 10-18-92; Title and Section, Ord. No. 173,186, Eff. 5-22-00; Subsec. F, Ord. No. 173,285, Eff. 6-26-00, Oper. 7-1-00.*

**EXHIBIT C**
**AFFIRMATIVE ACTION**

Page 3

# LOS ANGELES ADMINISTRATIVE CODE
## Div. 10, Ch. 1, Art. 1

## CHILD SUPPORT

**Sec. 10.10. Child Support Assignment Orders.**

a. Definitions.

1. **Awarding Authority** means a subordinate or component entity or person of the City (such as a City department or Board of Commissioners) that has the authority to enter into a contract or agreement for the provision of goods or services on behalf of the City of Los Angeles.

2. **Contract** means any agreement, franchise, lease or concession including an agreement for any occasional professional or technical personal services, the performance of any work or service, the provision of any materials or supplies, or the rendering of any service to the City of Los Angeles or to the public which is let, awarded or entered into with, or on behalf of, the City of Los Angeles or any awarding authority thereof.

3. **Contractor** means any person, firm, corporation, partnership or any combination thereof which submits a bid or proposal or enters into a contract with any awarding authority of the City of Los Angeles.

4. **Subcontractor** means any person, firm, corporation, partnership or any combination thereof who enters into a contract with a contractor to perform or provide a portion of any contract with the City.

5. **Principal Owner** means any person who owns an interest of 10 percent or more in a contractor or subcontractor as defined herein.

b. Mandatory Contract Provisions.

Every contract that is let, awarded or entered into with or on behalf of the City of Los Angeles shall contain a provision obligating the contractor or subcontractor to fully comply with all applicable State and Federal employment reporting requirements for the contractor or subcontractor's employees. The contractor or subcontractor will also be required to certify that the principal owner(s) thereof are in compliance with any Wage and Earnings Assignment Orders and Notices of Assignment applicable to them personally, that the contractor or subcontractor will fully comply with all lawfully served Wage and Earnings Assignment Orders and Notices of Assignments in accordance with California Family Code §§ 5230 *et seq.* and that the contractor or subcontractor will maintain such compliance throughout the term of the contract.

Failure of a contractor or subcontractor to comply with all applicable reporting requirements or to implement lawfully served Wage and Earnings Assignments or Notices of Assignment or failure of the principal owner(s) to comply with any Wage and Earnings Assignments or Notices of Assignment applicable to them personally shall constitute a default under the contract. Failure of the contractor or subcontractor or-principal owner thereof to cure the default within 90 days of notice of such default by the City shall subject the contract to termination.

c. Notice to Bidders.

Each awarding authority shall be responsible for giving notice of the provisions of this ordinance to those who bid on, or submit proposals for, prospective contracts with the City.

d. Current Contractor Compliance.

Within 30 days of the operative date of this ordinance, the City, through its operating departments, shall serve upon existing contractors a written request that they and their subcontractors (if any) comply with all applicable State and Federal employment reporting requirements for the contractor and subcontractor's employees, that they certify that the principal owner(s) of the contractor and any subcontractor are in compliance with any Wage and Earnings Assignment Orders and Notices of Assignment applicable to them personally, that the contractor and subcontractor will fully comply with all lawfully served Wage and Earnings Assignment Orders and Notices of Assignments in accordance with California Family Code § §5230 *et seq*. and that the contractor and subcontractor will maintain such compliance throughout the term of the contract.

# EXHIBIT D
## CHILD SUPPORT

Page 1

e.  City's Compliance with California Family Code.

The City shall maintain its compliance with the provisions of California Family Code §§ 5230 *et seq.* and all other applicable law regarding its obligations as an employer to implement lawfully served Wage and Earnings Assignments and Notices of Assignment.

f. Report of Employees' Names to District Attorney.

1.  The City shall maintain its current practice of assisting the District Attorney's support enforcement activities by annually reporting to the Los Angeles County District Attorney the names of all of its employees and retirees so that the District Attorney may identify those employees and retirees subject to Wage and Earnings Assignment Orders and Notices of Assignment and may establish court orders for support, where appropriate.  Should the District Attorney so request it, the City will provide such information on a more frequent basis.

2.  All applicants for employment with the City of Los Angeles will be asked to acknowledge their responsibility to comply with any court ordered support obligations and will be advised of the City's practice of assisting the District Attorney as described in the provisions of Subsection f.1., above.

### SECTION HISTORY

*Added by Ord. No. 172,401, Eff. 2-l3-99.*

# EXHIBIT D
## CHILD SUPPORT

Page 2

## ALTERNATIVE FUEL VEHICLE REQUIREMENT PROGRAM
## (LAX ONLY)

### I.  **Definitions**.

The following capitalized terms shall have the following meanings. All definitions include both the singular and plural form.

"Airport Contract" shall mean a contract awarded by LAWA and pertaining to LAX, and subcontracts of any level under such a contract.

"Airport Contractor" shall mean (i) any entity awarded an Airport Contract, and subcontractors of any level working under an Airport Contract; (ii) any contractors that have entered into a contract with an Airport Lessee to perform work on property owned by LAWA and pertaining to LAX, and any subcontractors working in furtherance of such a contract; and (iii) any contractor that have entered into a contract with an Airport Licensee to perform work pertaining to LAX, and any subcontractors working under such a contract.

"Airport Lessee" shall mean any entity that leases or subleases any property owned by LAWA and pertaining to LAX.

"Airport Licensee" shall mean any entity issued a license or permit by LAWA for operations that pertain to LAX.

"Alternative-Fuel Vehicle" shall mean a vehicle that is not powered by petroleum-derived gasoline or diesel fuel.  Alternative-Fuel Vehicles include, but are not limited to, vehicles powered by compressed or liquefied natural gas, liquefied petroleum gas, methanol, ethanol, electricity, fuel cells, or other advanced technologies.

"CARB" shall mean the California Air Resources Board.

"Covered Vehicle" is defined in Section II below.

"Compliance Plan" is defined in subsection VII.C. below.

"EPA" shall mean the United States Environmental Protection Agency.

"Independent Third Party Monitor" shall mean a person or entity empowered by LAWA to monitor compliance with and/or implementation of particular requirements in this Requirement.

"LAWA" shall mean Los Angeles World Airports.

"LAX" shall mean Los Angeles International Airport.

"Least-Polluting Available Vehicle" shall mean a vehicle that (a) is determined by an Independent Third Party Monitor to be (i) commercially available, (ii) suitable for performance

## EXHIBIT E
**ALTERNATIVE FUEL VEHICLE REQUIREMENT PROGRAM (LAX ONLY)**

of a particular task, and (iii) certified by CARB to meet the applicable engines emission standard in effect at the time of purchase. Where more than one vehicle meets these requirements for a particular task, LAWA, working with the Independent Third Party Monitor, will designate as the Least-Polluting Available Vehicle the vehicle that emits the least amount of criteria air pollutants.

"LEV" shall mean a vehicle that meets CARB's Low-Emission Vehicle standards for criteria pollutant exhaust and evaporative emissions for medium-duty vehicles at the time of vehicle manufacture.

"LEV II" shall mean a vehicle certified by CARB to the "LEV II" Regulation Amendments that were fully implemented as of 2010.  A qualifying "LEV II" vehicle shall meet the least polluting standard in the LEV II category that is available at the time of purchase.

"LEV III" shall mean a vehicle certified by CARB to the increasingly stringent "LEV III" Regulatory Amendments to the California greenhouse gas and criteria pollutant exhaust and evaporative emission standards, test procedures, and on-board diagnostic system requirements for medium-duty vehicles.

"Low-Use Vehicle" shall mean a Covered Vehicle that makes less than five (5) trips per month to LAX.

"Operator" shall mean any Airport Contractor, Airport Lessee, or Airport Licensee.

"Optional Low NOx" shall mean any vehicle powered by an engine that meets CARB's optional low oxides of nitrogen (NOx) emission standards for on-road heavy-duty engines applicable at the time of purchase.

**II.   Covered Vehicles.**
    A. **Covered Vehicles**.  These Requirements shall apply to all on-road vehicles, including trucks, shuttles, passenger vans, and buses that are 8,500 lbs gross vehicle weight rating or more and are used in operations related to LAX ("Covered Vehicles").

    B. **Exemptions**.  The following vehicles are exempt from this Requirement:

      i)   Public safety vehicles.

      ii)  Previously approved vehicles.  Vehicles previously approved under the 2007 LAX Alternative Fuel Vehicle Requirement Program are exempt from the Maximum Allowable Vehicle Age Requirement, Section III, but are subject to the Annual Reporting Requirement, Section VI.

      iii) Low-Use Vehicles.  Low-use vehicles are exempt from the Compliance Schedule, Section IV, the Maximum Allowable Vehicle Age Requirement, Section III, but are subject to the Annual Reporting Requirement, Section VI.

**III.   Maximum Allowable Vehicle Age Requirement.** In accordance with the Compliance Schedule dates outlined in Section IV, no Covered Vehicle equipped with an engine older than

**EXHIBIT E**
**ALTERNATIVE FUEL VEHICLE REQUIREMENT PROGRAM (LAX ONLY)**

thirteen (13) model years or that has 500,000 or more miles, whichever comes first, shall operate at LAX.

**IV.  Compliance Schedule.**
   A. By April 30, 2019, one hundred percent (100%) of the Covered Vehicles operated by a Covered Vehicle Operator shall be (a) Alternative-Fuel Vehicles, (b) Optional Low NOx vehicles or (c) LEV II standard vehicles through 2019 or LEV III standard vehicles thereafter.

   B. A new Covered Vehicle Operator who plans to begin operations at LAX prior to April 30, 2019, must comply with the requirement set forth in Section III and subsection IV.A. prior to commencing operations at LAX.

**V.   Least-Polluting Available Vehicles.** In cases where an Operator cannot comply with the requirements established pursuant to Sections III and IV above because neither Alternative-Fuel Vehicles, Optional Low NOx standard vehicles, or LEV II standard vehicles through 2019 and LEV III standard vehicles thereafter, are commercially available for performance of particular tasks, LAWA will instead require Operators to use the Least-Polluting Available Vehicles for such tasks. An Independent Third Party Monitor will determine whether Alternative-Fuel Vehicles, Optional Low NOx standard vehicles, or LEV II standard vehicles through 2019 and LEV III standard vehicles thereafter are commercially available to perform particular tasks, and, in cases where neither Alternative-Fuel Vehicles, Optional Low NOx standard vehicles, nor LEV II standard vehicles through 2019 and LEV III standard vehicles thereafter are commercially available for performance of a particular task, will identify the Least-Polluting Available Vehicle for performance of that task.

**VI.  Annual Reporting Requirement.**
   A. By January 31st of each calendar year, Covered Vehicle Operators must submit to LAWA the vehicle information required on the reporting form accessible online at https://online.lawa.org/altfuel/ for the prior calendar year.

   B. Low-Use Vehicles shall be included in the annual reporting.  Where monthly trip data is used to establish low-use, the operator must provide proof such as transponder data records or an attestation acceptable to LAWA.

   C. A Covered Vehicle Operator who plans to begin operations at LAX must comply with this reporting requirement prior to commencing operations, and thereafter comply with the annual reporting deadline of January 31st of each calendar year.

**VII.  Enforcement.**
   A. **Non-Compliance**.  The following circumstances shall constitute non-compliance for purposes of this Section VII:

   i)  Failure to submit an annual report pursuant to Section VI above.

   ii) Failure to use an Alternative Fuel Vehicle, an Optional Low NOx vehicle, a vehicle meeting LEV II standards prior to December 31, 2019, or LEV III standards

**EXHIBIT E**
**ALTERNATIVE FUEL VEHICLE REQUIREMENT PROGRAM (LAX ONLY)**

thereafter, an approved Least-Polluting Available Vehicle, or a vehicle approved under LAWA's former Alternative Fuel Vehicle Requirement, including approved comparable emissions vehicles.

iii) Failure to submit a Compliance Plan as defined in subsection VII.C. below within 30 days of notice of non-compliance from LAWA.

iv) Failure to adhere to an approved Compliance Plan as defined in subsection VII.C. below.

B. **Notice of Non-Compliance**. Covered Vehicle Operators found not to be in compliance with the Alternative Fuel Vehicle Requirement as set forth in subsection VII.A. above will be given a notice of non-compliance.  Covered Vehicle Operators will have 30 days to correct the deficiencies documented in the notice of non-compliance by completing the annual report as defined in Section VI or submitting a Compliance Plan as defined in subsection VII.C. below, as applicable to the reason cited for non-compliance.

C. **Compliance Plan.**

i)   Operators shall transition to compliant vehicles as soon as practicable.

ii)  Non-compliant Covered Vehicle Operators will be required to submit a Compliance Plan indicating the disposition (salvage, replace, remove from service, etc.) date for each non-compliant vehicle ("Compliance Plan") within 30 days of receiving a notice of non-compliance for a vehicle in the Operator's fleet. The Compliance Plan shall provide dates by which the non-compliant vehicle or vehicles in the Operator's fleet will meet the requirements of the LAX Alternative Fuel Vehicle Requirement and a justification for the new date. The Compliance Plan shall be signed under attestation.

iii) LAWA's Chief Executive Officer or his/her designee shall review the Operator's Compliance Plan and justification to determine its acceptability and authorize approval or disapproval.

iv) Covered Vehicle Operators shall have 30 days to seek review of  LAWA's rejection of a Compliance Plan or any parts thereof by LAWA's Chief Executive Officer or his/her designee.

D. **Default.**  Three or more instances of non-compliance with the LAX Alternative Fuel Vehicle Requirement as defined in subsection VII.A above within two years shall be considered a default of the applicable LAX permit, license, contract, lease, Non-Exclusive License Agreement (NELA), concessionaire agreement, and/or Certified Service Provider (CSP) Program.  LAWA's Chief Executive Officer or his/her designee may, pursuant to the applicable terms provided therein, suspend or cancel a permit, license, contract, lease, NELA,  concessionaire agreement or certified provider certification of non-compliant Covered Vehicle Operators who are not in compliance with this Alternative Fuel Vehicle Requirement.  In addition, LAWA's Chief Executive Officer or his/her designee may seek to recoup LAWA's administrative costs from non-compliant operators.

**IX.   Periodic Review.**  This Requirement will be reviewed and updated periodically as deemed necessary by LAWA.

## EXHIBIT E
**ALTERNATIVE FUEL VEHICLE REQUIREMENT PROGRAM (LAX ONLY)**

Page 4

# EXHIBIT "B"

# CITY OF LOS ANGELES



# RULES AND REGULATIONS

# IMPLEMENTING

# THE LIVING WAGE ORDINANCE

**EFFECTIVE MARCH 20, 2018**

Department of Public Works
Bureau of Contract Administration
Office of Contract Compliance
1149 S. Broadway Street, 3rd Floor
Los Angeles, CA 90015
http://www.bca.lacity.org
email: bca.eeoe@lacity.org

# RULES AND REGULATIONS
# IMPLEMENTING THE LIVING WAGE ORDINANCE

SCOPE OF BCA AUTHORITY.................................................................................2

DEFINITIONS ....................................................................................................... 2

REGULATION #1: DETERMINING APPLICABILITY OF LWO TO AGREEMENTS....... 4

REGULATION #2: RFP/RFB AND AGREEMENT REVIEW PROCESS........................7

REGULATION #3: CONTRACTS NOT SUBJECT TO THE LWO.............................. 10

REGULATION #4: CBA EXEMPTION.................................................................... 12

REGULATION #5: OTHER EXEMPTIONS ............................................................ 13

REGULATION #6: EMPLOYER REQUIREMENTS ...................................................17

REGULATION #7: REPORTING AND RECORD KEEPING....................................... 23

REGULATION #8: MONITORING AND INVESTIGATION.......................................... 24

REGULATION #9: ENFORCEMENT ..................................................................... 25

REGULATION #10: EMPLOYEE COMPLAINT PROCESS ....................................... 26

REGULATION #11: RFP AND STANDARD LWO CONTRACT LANGUAGE.............. 27

REGULATION #12: HEALTH CARE BENEFIT COSTS............................................ 28

REGULATION #13: INSTALLMENT PAYMENTS OF RESTITUTION.......................... 30

REGULATION #14: INDUSTRY SPECIFIC CLASSIFICATIONS ............................... 31

REGULATION #15: COMPENSATED RELEASE TIME……………………………………..32

APPENDIX A ..................................................................................................... 33

**RULES AND REGULATIONS
IMPLEMENTING THE LIVING WAGE ORDINANCE**

The Department of Public Works, Bureau of Contract Administration ("BCA") promulgates these Rules and Regulations as the Designated Administrative Agency ("DAA") pursuant to Sections 10.37.1(h) and 10.37.7 of the Los Angeles Administrative Code ("LAAC"). Each Awarding Authority shall cooperate to the fullest extent with the BCA in the administration of the Living Wage Ordinance ("LWO"). The BCA may amend or revise these LWO Rules and Regulations from time to time, consistent with applicable law.

**SCOPE OF BCA AUTHORITY**

Under LAAC Sections 10.37.6 and 10.37.7, the BCA administers, monitors, and enforces the LWO. When necessary to carry out its function as the DAA, the BCA may conduct inquiries and investigations into areas outside of the LWO to determine compliance with the LWO.

**DEFINITIONS**

For purposes of these Rules and Regulations, the definitions set forth in LAAC Section 10.37.1 are incorporated herein by reference. In addition, the following definitions shall apply in these Rules and Regulations:

**"Agreement"** includes a contract for services, leases or licenses, subleases or sublicenses, loan agreements, agreements involving City financial assistance, grant-funded agreements, and permits.

**"Bidder"** includes an applicant for any Agreement that is subject to the LWO, whether under a competitive bid, request-for-proposal (RFP) or other procurement process.

**"BCA"** refers to the Department of Public Works, Bureau of Contract Administration, Office of Contract Compliance.

**"Child Care Worker"** means an employee whose work on an Agreement involves the care or supervision of children 12 years of age and under.

**"Employee,"** as defined in LAAC Section 10.37.1(h) of the LWO and for purposes of these Rules and Regulations, includes full-time employees, part-time employees, probationary employees, and trainees. For purposes of these Rules and Regulations, an owner of a business shall not be considered an employee.

**"Managerial Employee"** or **"Supervisory Employee"** as used in LAAC Section 10.37.1(h) of the LWO means a person who has the authority to hire, transfer, suspend, lay off, recall, promote, discharge, assign, reward, or discipline other subordinate Employees, or the responsibility to direct them, adjust their grievances, or effectively to recommend such action, if, in connection with the foregoing, the exercise of such authority is not of a merely routine or clerical nature, but requires the use of independent judgment.

2

**RULES AND REGULATIONS**
**IMPLEMENTING THE LIVING WAGE ORDINANCE**

**"Confidential Employee"** as used in LAAC Section 10.37.1(h) of the LWO means an Employee whose duties involve access to confidential information usually in regard to Employer's labor relations.

**"Feasibly"** as used in reference to services that the City's employees could perform, means that the performance by City employees is not prohibited by law under the circumstances, if given adequate financial and staffing resources. Awarding departments must be able to provide BCA with a 1022 Determination.

**"Prime Contractor"** means an Employer, a contractor, lessee, licensee, and City financial assistance recipient that has executed an Agreement with the City.

3

**RULES AND REGULATIONS
IMPLEMENTING THE LIVING WAGE ORDINANCE**


**REGULATION #1: DETERMINING APPLICABILITY OF LWO TO AGREEMENTS**

**Departmental Determination of Coverage**
An Awarding Authority is responsible for making an initial determination of whether an Agreement is subject to the LWO. However, the BCA will make the final decision. If the Awarding Authority is incorrect, the Employer is still subject to the requirements of the LWO. The Awarding Authority shall apply the following guidelines in making the initial determination of coverage:

**(a) Liberal Interpretation and  Rebuttable Presumption of Coverage**
An Agreement, request for proposal (RFP), or request for bid (RFB) is presumed to be covered by the LWO pursuant to LAAC Section 10.37.13. The Awarding Authority shall incorporate the standard LWO contract language referred to in Appendix A into the Agreement, RFP, or RFB unless the Agreement, RFP, or RFB is not covered by the LWO pursuant to Regulations # 2 and # 3.

**(b) Determination of Whether an RFP/RFB or Agreement for Services Meets the LWO Threshold**
An Awarding Authority shall use the following guidelines, in addition to the provisions specified in the LWO, to determine whether an Agreement for services meets the time or monetary thresholds of the LWO:

(1) <u>Time: Three Months in Duration</u>: In determining whether an Agreement is 3 months or longer in duration, the Awarding Authority shall calculate the term of the Agreement using the starting date of the original Agreement and the ending date that appears in the most recent amendment, modification, renewal or extension. An Agreement previously exempt from the LWO because it did not meet the time threshold of the LWO may become subject to the LWO because an amendment, modification, renewal, or extension increases the term of the Agreement. In that case, the Awarding Authority shall incorporate the standard LWO contract language referred to in Appendix A into the Agreement.

(2) <u>Money: Over $25,000</u>: In determining whether an Agreement exceeds $25,000, the Awarding Authority shall calculate the total amount of the Agreement by adding together the amount provided for in the original Agreement and all amendments, modifications, renewals, or extensions. An Agreement previously exempt because it did not meet the monetary threshold of the LWO may become subject because an amendment, modification, renewal, or extension increases the total amount of the Agreement. In that case, the Awarding Authority shall incorporate the standard LWO contract language referred to in Appendix A into the Agreement.

(3) <u>An Agreement with maximum amounts or for services to be performed as-needed</u>:

(A) If an Agreement specifies a maximum amount to be expended, the Awarding

4

**RULES AND REGULATIONS
IMPLEMENTING THE LIVING WAGE ORDINANCE**

Authority shall use the maximum amount stated in the Agreement to determine whether the Agreement meets the monetary threshold of more than $25,000.

(B) If an Agreement is for services that are to be performed on an as-needed basis, the Agreement is presumed to be covered by the LWO. The Employer will not be required to comply with the wage and benefit requirements of the LWO until the City has used over $25,000 in services from the Employer or the invoices submitted by the Employer total over $25,000. Once the $25,000 threshold is exceeded, the Employer must comply with all requirements of the LWO.

(4) An Agreement to purchase or rent goods or equipment: This Agreement may be subject to the LWO if the agreement is over $25,000, at least 3 months in duration, and the Agreement contains provisions for services that are not incidental services.

(5) An Agreement which calls for an Employer to perform in-kind services as repayment to the City: The amount used to determine the monetary threshold shall be the value of the consideration that the Employer receives in return for the in-kind services provided to or for the City.

**(c) Public Lease and License**
Leases and licenses which involve services to be performed on City property are presumed subject to the LWO if they meet any one of the criteria stated in Section 10.37.1(l) of the LWO.

Note: A contractor that has a lease with the Los Angeles World Airport (LAWA) but does not provide services to LAWA is still considered a Public Lease and License. The contractor is subject to Section 10.37.2(a)(1) rather than Section 10.37.2(a)(2). An example is the golf course at Palmdale. The contractor is leasing property from LAWA but does not provide services to LAWA (such as cargo handling etc.), therefore they are not subject to the higher LAWA LW rates.

**(d) Agreements that Give the City a Unilateral Option to Renew**
If an Agreement is not yet subject to the provisions of the LWO, but the services called for under the Agreement are performed by workers who earn less than the LWO wage rate, the Awarding Authority should not exercise any unilateral option to renew the Agreement unless the Employer agrees to comply with the provisions of the LWO by incorporating the standard LWO contract language referred to in Appendix A into the renewed Agreement or through a supplemental Agreement. When this is not possible, the Awarding Authority should attempt to procure a new Agreement through a new RFP, RFB or other process.

**(e) Agreements Made Subject to the LWO by Action of City Council**
Agreements made subject to the LWO by an action of the City Council shall be subject to the LWO and all its requirements in the same way as an Agreement determined to be subject by an Awarding Authority. The Awarding Authority or City department responsible

5

**RULES AND REGULATIONS**
**IMPLEMENTING THE LIVING WAGE ORDINANCE**

for the drafting and/or administration of the Agreement shall be responsible for ensuring that the Agreement complies with the requirements of the LWO and these Rules and Regulations.

Note: Council File #10-1797-S16: By action of the City Council, the Zero Waste LA Exclusive Franchise System for commercial and multifamily solid waste collection and handling contractors are subject to the LWO.

6

**RULES AND REGULATIONS
IMPLEMENTING THE LIVING WAGE ORDINANCE**

**REGULATION #2: RFP/RFB AND AGREEMENT REVIEW PROCESS**

Except for Authorizations for Expenditures (AFEs) that require no letter of agreement, construction contracts, Agreements with governmental entities, Agreements solely for the purchase or rental of goods, equipment, or property, or Agreements for less than 3 months or less than $25,000, the Awarding Authority shall follow the procedures outlined in these Rules and Regulations before issuing a RFP, RFB, or awarding or executing any Agreement:

**(a) Presumption of Coverage and Incorporation of Standard LWO Contract Language**
An RFP, RFB, or Agreement is presumed to be covered by the LWO and must incorporate the standard LWO contract language referred to in Appendix A, unless the BCA has confirmed in writing that the RFP, RFB, or Agreement is exempt from the provisions of the LWO.

**(b) Awarding Authority's Initial Determination of the LWO's Applicability to RFPs and RFBs**:
The Awarding Authority shall determine if the RFP/RFB is subject to the LWO using the guidelines discussed in Regulation #1.

(1) If the service to be performed under the Agreement is subject to the LWO, the Awarding Authority shall incorporate into the RFP/RFB the standard LWO contract language and the Bidder/Employer application for exemption form referred to in Appendix A.

(2) Unless otherwise provided for in Regulation #3, if the Awarding Authority believes that the RFP/RFB is exempt or not covered by the LWO, prior to releasing the RFP/RFB, the Awarding Authority must request written confirmation from the BCA using the application for non-coverage or exemption form referred to in Appendix A.

**(c) BCA Confirmation of Exemption or Non-Coverage Required to Rebut Presumption of Coverage**
Within ten (10) working days of receipt of an Awarding Authority's application for exemption or non-coverage, the BCA shall make a final determination whether the LWO applies to the Agreement.

(1) If the BCA approves the request for exemption, the Awarding Authority shall proceed with the normal and customary process of issuing RFPs/RFBs and rating all Bidders for the Agreement. The original request for exemption approved by the BCA shall be incorporated into the executed Agreement. After execution of the Agreement, the Awarding Authority shall provide the BCA a "Departmental Guidance Form" and a copy of the executed Agreement.

7

**RULES AND REGULATIONS**
**IMPLEMENTING THE LIVING WAGE ORDINANCE**

(2) If the BCA denies the request for exemption, the Awarding Authority shall process the RFP/RFB as subject the LWO.

**(d) Department Review of Submitted Bids and Proposals for Exemptions Request**
The Awarding Authority shall review the submitted bid or proposal to determine if a Bidder has submitted a Departmental or Non-Coverage/Exemption Application. A Bidder applying for exemption from the LWO must submit a separate Departmental or Non-Coverage/Exemption Application for each bid or Agreement, regardless of whether the Bidder has previously submitted an application, or was granted an exemption in relation to another bid or Agreement.

**(e) Non-Coverage/Exemption Submitted with Bid or Proposal**
If the Bidder submits a Departmental or Non-Coverage/Exemption Application, the Awarding Authority shall review the application to ensure that all supporting documentation has been submitted, and that the application meets the requirements specified in Regulation #3. If an application has been submitted, the Awarding Authority shall retain copies of the form and any supporting documentation with the Agreement. If an application for exemption has been submitted, the Awarding Authority shall forward the application and supporting documentation to the BCA for confirmation. The BCA shall make a final determination within ten (10) working days of receiving the completed application.

(1) A determination by the BCA that the Bidder is exempt from the LWO only exempts the Bidder from the LWO in relation to the Agreement currently processed. The BCA approval of the application does not exempt the Bidder for any other bid or Agreement nor does it extend to the Bidder's Subcontractors. The Bidder remains subject to the LWO prohibition against retaliation and the obligation to ensure that all Subcontractors comply with the LWO.

(2) A determination by the BCA that the Bidder is subject to the LWO obligates the Bidder to comply with all requirements of the LWO.

**(f) Selection of Bidder, Award, and Execution of Agreement**
In executing an Agreement determined to be subject to the LWO, the Awarding Authority shall incorporate into the Agreement the standard LWO contract language referred to in Appendix A. In executing an Agreement exempt or not covered by the LWO, the Awarding Authority shall retain the original Departmental or Non-Coverage/Exemption Application form approved by the BCA with the Agreement file.

**(g) Employee Information and Subcontractor Information**
Prior to or by the execution date of the Agreement, the Awarding Authority shall provide the selected Bidder with the Employee and Subcontractor information reporting form(s) referred to in Appendix A. The Awarding Authority shall instruct the selected Bidder to complete and submit the form(s) within 10 days of execution of the Agreement.

**(h) Submission of Copies of the Executed Agreement**

8

**RULES AND REGULATIONS**
**IMPLEMENTING THE LIVING WAGE ORDINANCE**

Upon execution of the Agreement, the Awarding Authority shall provide to the BCA a copy of the completed "Departmental Guidance Form" found in Appendix A and a copy of the executed Agreement.

**(i) Responsibility When More Than One Awarding Authority Is Involved**
The Awarding Authority or City department responsible for the drafting and/or administration of the Agreement shall be responsible for ensuring that the requirements of the LWO and these Rules and Regulations are adhered to prior to execution of any Agreement.

9

**RULES AND REGULATIONS**
**IMPLEMENTING THE LIVING WAGE ORDINANCE**


**REGULATION #3: CONTRACTS NOT SUBJECT TO LWO**

An Agreement may not be subject to the LWO if it meets certain requirements. If the BCA determines that the services called for in an Agreement are not covered by the LWO because the City is legally prohibited from engaging in such services or because it would be highly unlikely under the circumstances for the City to become involved in such services, the BCA may determine the Agreement is not subject to the LWO. When an Agreement is not subject to the LWO, neither the Employer nor any of its Subcontractors working on the Agreement will be subject to the LWO.

**(a) Contracts that are not subject to the LWO**
Departments do <u>not</u> need to request BCA to approve an exemption and Employers do <u>not</u> need to submit an application.

> **(1) Less than three months OR less than $25,000 - LAAC Section 10.37.1(l):** Service Contracts or Authority for Expenditures that do not meet these thresholds are not subject to the LWO.

> **(2) Governmental Entities – LAAC Section 10.37.14(b):** Agreements with governmental entities are not subject to the requirements of the LWO. If an Agreement is not subject to the LWO because the Employer is a governmental entity, Subcontractors performing work for the governmental entity on the Agreement are also not subject to the LWO.

> **(3) Purchase of Goods or Property – LAAC Section 10.37.1(l)**: Such contracts are not subject to the LWO unless they include a service component that is more than just incidental.

> **(4) Construction contracts LAAC Section 10.37.14(a)**: Construction contracts are not subject to the LWO unless 1) there are Employees not covered by prevailing wage or 2) if the prevailing wage is less than the required rate in 10.37.2.

> **(5) Utilities Companies LAAC Section 10.37.14 (c):** Agreements for work done directly by a utility company pursuant to an order of the Public Utilities Commission.

> **(6) City Financial Assistance Recipients (CFAR) Below LWO Thresholds – LAAC Section 10.37.1(e):** Agreements that provide an Employer with City financial assistance intended to promote economic development or job growth (activities that expand the production, distribution or consumption of goods or services, increase the employment or skills level of the city workforce, effect the efficient use of material or nonmaterial resources, or have practicable and industrial significance) are not subject to the LWO if they do not meet either of the monetary thresholds described in the LWO. Thus, such Agreements are not subject to the LWO if the assistance given in a 12-month period is below $1,000,000 and less than $100,000 per year on a continuing basis.

> Example: The City approves a loan to a Employer of $5,000,000 for the development of shopping center that will create new jobs. The loan is for 20 years

10

**RULES AND REGULATIONS**
**IMPLEMENTING THE LIVING WAGE ORDINANCE**

at an interest rate of 4%. At the time the Awarding Authority grants approval for the loan, the Applicable Federal Rate (AFR) referenced in the LWO is 4.6%. This Amendment is not subject to the LWO because it does not meet the financial thresholds, as explained below:

The amount of financial assistance used to determine whether the Employer meets the LWO thresholds is amount the Employer saves in interest payments. To determine the amount of savings on interest payments (the financial assistance), the annual savings on interest rate is calculated as follows:

Financial Assistance = (Amount of Loan @ AFR) – (Amount of Loan @ City rate)
Financial Assistance = ($5,000,000 x 4.6%) – ($5,000,000 x 4%)
Financial Assistance = $230,000 – $200,000
Financial Assistance = $30,000

Thus, the Employer receives $30,000 in financial assistance per year for the next 20 years. This is less than $1,000,000 in a year, <u>and</u> less $100,000 per year on a continuing basis. Therefore, the Employer is not subject to the LWO. No approval from the BCA is required and the Awarding Authority may indicate this on the Departmental Determination of Coverage form.

11

**RULES AND REGULATIONS**
**IMPLEMENTING THE LIVING WAGE ORDINANCE**

**REGULATION #4: CBA EXEMPTION**

**Express Exemption by Collective Bargaining Agreement – LAAC Section 10.37.12:**
An Employer subject to provisions of the LWO may, by collective bargaining agreement (CBA), expressly provide that the CBA, during its term, shall supersede the requirements of the LWO for those Employees covered by the CBA. The provisions of the LWO should not be interpreted to require that an Employer reduce the wages and benefits required by a CBA. All parties to the CBA must expressly waive, in full or in part, the benefits required by the LWO. An Employer applying for this exemption shall submit a copy of the CBA. If the CBA does not expressly indicate that the LWO has been superseded, the Employer shall submit written confirmation from the union representing the Employees working on the Agreement that the union and the Employer have agreed to let the CBA supersede the LWO.

(a) If the final CBA signed by the Employer and the union supersedes the LWO, in full or in part, the Employer shall be considered to be exempt from the LWO's specified provisions for the time period covered by the effective dates of the superseding CBA. The Employer remains subject to all applicable provisions of the LWO for the time period not covered by the superseding CBA. If the Employer has not complied with the LWO requirements during the time period not covered by the superseding CBA, the Employer shall be required to make retroactive corrections for any period of violation, which may include making retroactive payments to affected Employees for the relevant periods of violation.

(b) If the final CBA signed by the Employer and the union does not supersede the LWO, the Employer shall be required to comply with all applicable LWO requirements, including the wage and benefits provisions. Compliance shall also be required retroactively to the date that the Employer first became subject to the LWO. If necessary, the Employer shall provide retroactive payments to affected Employees for any time period during which the Employer did not comply with the LWO.

**CBA Exemption for Employers servicing the Airport – LAAC Section 10.37.12(a): In addition to the above requirements, Employers servicing the Airport may only be exempt if its Employees are paid a wage not less than the applicable wage rate in Section 10.37.2(a)(2)(i). Supporting documents such as payroll must be provided to BCA.**

**CBA Exemption for Airline Food Caterer -  LAAC Section 10.37.12(b): In order for Airline Food Caterers to receive a CBA exemption, its Employees must be paid a total economic package no less than the applicable wage rate in Section 10.37.2(a)(2)(ii). Supporting documents such as payroll and health benefit statements must be provided to BCA.**

12

**RULES AND REGULATIONS
IMPLEMENTING THE LIVING WAGE ORDINANCE**

## REGULATION #5: OTHER EXEMPTIONS

### Employer Exemptions which Require BCA approval

**The following exemption categories require that the BCA approve an exemption application for the exemption to be valid.** However, even with an approved exemption, the Employer must still comply with the LAAC Section 10.37.5 of the LWO regarding prohibition against retaliation. If the BCA denies a Bidder or Employer's application for exemption, the Bidder or Employer must comply with all requirements of the LWO.

The exemption categories include:

(a) **Non-Profit 501(c)(3) Organizations:** A corporation claiming exemption under LAAC Section 10.37.15(b) of the LWO as a corporation organized under Section 501 (c)(3) of the United States Internal Revenue Code must provide the following additional documents in support of the application for exemption:

   (1) A copy of the most recent IRS letter indicating that the Employer has been recognized as a non-profit corporation organized under section 501 (c)(3) of the United States Internal Revenue Code.

   (2) The Departmental Exemption Application referred to in Appendix A must list the salary of the corporation's chief executive officer (CEO), computed on an hourly basis, and the hourly wage rate of the lowest paid worker in the corporation. The salary of the CEO, when computed on an hourly basis, must be less than 8 times what the lowest paid worker is paid on an hourly basis. For the purpose of this exemption, the "chief executive officer (CEO)" means the CEO of the 501(c)(3) corporation that entered into the Agreement with the City, or the highest paid person employed by the corporation if the CEO is not the highest paid employee. The "lowest paid worker" refers to the lowest paid worker employed by the 501(c)(3) corporation that entered into the Agreement with the City, regardless of whether the person works on the City Agreement. In calculating the salary of the CEO and the wage rate of the lowest paid worker, the corporation may not include items such as cash allowances for car expenses, meals, parking, or the value of pension plan contributions.

   Child Care Workers: Even if a corporation meets the requirements for exemption as a 501(c)(3) non-profit organization, if the corporation provides child care services as part of the City Agreement or employs Child Care Workers who will work on the City Agreement, the corporation must pay all Child Care Workers working on the subject Agreement the required LWO wage rate. All of the LWO requirements, including compensated and uncompensated days off, are applicable to those Child Care Workers.

(b) **Small Business Exemptions for Public Lessees and Licensees – LAAC**

13

**RULES AND REGULATIONS**
**IMPLEMENTING THE LIVING WAGE ORDINANCE**

**Section 10.37.15(a):** A public lessee or licensee claiming exemption from the LWO under LAAC Section 10.37.15(a) shall submit the application for "Small Business Exemption" referred to in Appendix A, along with supporting documentation to verify that it meets the requirement that the lessee or licensee employs no more than seven (7) people on and off City property.

(a) For purposes of this exemption, a lessee or licensee shall be deemed to employ a person if the person works for a company or entity that is owned or controlled by the lessee or licensee, regardless of where the company or entity is located; or if the person works for a company or entity that owns or controls the lessee or licensee, regardless of where the company or entity is located.

Whether the lessee or licensee meets the seven (7) person limit shall be determined using the total number of people employed by all companies or businesses, which the lessee or licensee owns or controls, or which own or control the lessee or licensee. For purposes of this example, "control" means that one company owns a controlling interest in another company.

(b) If a business operated by the lessee or licensee is part of a chain of businesses, the total number of people includes all everyone employed by the entire chain of businesses unless the business operated by the lessee or licensee is an independently owned and operated franchise.

(c) A public lessee or licensee shall be deemed to employ no more than seven (7) people if its entire workforce (inclusive of the people falling within the guidelines stated in subsections (a) and (b) above) worked an average of no more than 1,214 hours per month for at least three-fourths of the of the previous calendar year.

(d) Proof of a small business under LAAC Section 10.37.15(a) may include, but not be limited to, the State of California Form DE – 9c and the equivalent of that form for businesses in other states.

Until the BCA approves the application for exemption, the lessee or licensee shall be subject to the LWO and shall comply with its requirements. If the BCA approves the exemption application, the lessee or licensee shall be exempt from the requirements of the LWO for a period of two years from the date of the approval. The exemption will expire two years from the date of approval, but may be renewable in two-year increments upon meeting the exemption requirements.

**(c) CFAR: First Year Financial Assistance Recipients – LAAC Section 10.37.1(e)(1):** A first-year CFAR applying for exemption under LAAC Section 10.37.1(e) (1) of the LWO shall submit documents with proof of its startup date and

14

**RULES AND REGULATIONS**
**IMPLEMENTING THE LIVING WAGE ORDINANCE**

workforce information. If the BCA grants an exemption on this basis, a first year CFAR is exempt from the LWO for a period of one year from the date the exemption is approved.

**(d) CFAR: Employing Fewer Than Five Employees – LAAC Section 10.37.1(e)(2):** To verify eligibility, a CFAR claiming exemption on the basis that it employs fewer than five (5) Employees for each working day in each of twenty (20) or more calendar weeks in the current or preceding calendar year shall submit payroll registers with its exemption application for that twenty (20) week period.

**(e) CFAR: Hardship Waivers for Job Training and Preparation Programs – LAAC Section 10.37.1(e)(3):** A CFAR that employs the long-term unemployed or provides trainee positions intended to prepare Employees for permanent positions may request an economic hardship waiver pursuant to LAAC Section 10.37.1(e)(3). The CFAR must submit to the Awarding Authority documentation of the program's demonstrated and projected results and economic hardship due to compliance with the LWO. The Awarding Authority will forward the documentation and its recommendation to the City Council for consideration. A copy of this recommendation shall be forwarded to the BCA.

**(f) Students – LAAC Section 10.37.15(c):** High school and college students employed in a work-study or employment program lasting less than three months will be exempt from the LWO. Other students participating in a work-study program will be exempt if the Employer can verify to the BCA that:

(i) The program involves work/training for class or college credit and student participation in the work-study program is for a limited duration, with definite start and end dates; or

(ii) The student mutually agrees with the Employer to accept a wage below the applicable LWO rate based on a training component desired by the student; or

(iii) The amount paid to the student is in the form of a scholarship or other stipend that is not based on the amount of work performed or number of hours worked.

To verify that the students are part of a work-study or employment program not covered by the LWO's wage and benefits requirements, the Employer must submit documentation detailing program policies and guidelines, the amount paid to the students, and any other relevant documentation requested by the BCA.

**(g) Employee's Health Benefit Waiver Request:** An Employee can request the BCA to waive the LWO's health benefit provisions if they provide proof they receive health benefits pursuant to LAAC Section 10.37.15(e). If the waiver is approved, the Employee is only entitled to the applicable hourly wage rate without health benefits. Should the BCA provide the Employee a waiver, the Employee must

15

**RULES AND REGULATIONS**
**IMPLEMENTING THE LIVING WAGE ORDINANCE**

provide a copy to his/her Employer and wait until the Employer can reasonably remove the Employee from the health benefits plan (usually during the enrollment period).

In order for an Employee to receive a waiver, they must submit form LW-27 and include a copy of their insurance card and their parent's/ domestic partner's/ or spouse's insurance card. They must also submit a statement from their parent's/ domestic partner's/ or spouse's employer or health insurance provider, stating that the waiver applicant receives insurance coverage through the subscriber. Employees who receive their health insurance through Medicare or the Department of Veteran Affairs, may also apply for a waiver provided that they provide proof that they are currently enrolled in an insurance plan from Medicare or the Department of Veteran Affairs.

An approved waiver does not require an Employer to waive its health plan benefits for any Employees. Since the Employer is not required to waive the health plan benefits, the BCA recommends an Employee first ascertain the Employer's agreement to accept the waiver.

A determination by the BCA that a Bidder or Employer is exempt from the LWO applies only to the Agreement for which the request or application was submitted. The BCA approval of the request or application for exemption does not exempt the Bidder or Employer for any other bid or Agreement. The exemption approval does not extend to any Subcontractor unless the Subcontractor separately applies for and is granted an exemption from the LWO.

## Agreement Exemptions which Require BCA approval

**Grant-funded Services:** Agreements let by the City involving federal or state grant funds shall be subject to the LWO unless the grant-funding agency indicates in writing that the provisions of the LWO should not apply. The Awarding Authority shall provide a copy of grant-funding agency's determination to the BCA. If BCA determines the grant-funded service is exempt from the LWO, neither the Employer nor any of its Subcontractors working on the Agreement will be subject to the LWO.

16

**RULES AND REGULATIONS**
**IMPLEMENTING THE LIVING WAGE ORDINANCE**

## REGULATION #6: EMPLOYER REQUIREMENTS

All Employers, (including Subcontractors, sublessees, and sublicensees) who lease City property or perform work or provide services pursuant to an Agreement that is subject to the LWO must comply with all requirements of the LWO and its Rules and Regulations. For purposes of these Rules and Regulations, Subcontractors, sublessees, and sublicensees may be referred to collectively as "Subcontractors."

**(a) Subcontractors Subject to the LWO if the Agreement is Subject to the LWO**
A Subcontractor performing work or providing services on an Agreement that is subject to the LWO is also subject to the LWO, unless the Subcontractor qualifies for an exemption stated in the LWO and these Rules and Regulations. A Subcontractor may be subject to the LWO even if the Prime Contractor has been granted an exemption from the LWO for a particular Agreement. A Prime Contractor is responsible for informing its Subcontractor of the Subcontractor's obligation to comply with the LWO. Language obligating the Subcontractor to comply with the LWO shall be included in each subcontract between the Prime Contractor and the Subcontractor. Failure to comply shall be a material breach of the Agreement (LAAC Section 10.37.4(d)).

If the BCA determines that a Prime Contractor intentionally entered into separate Agreements to keep subcontracts below the 3 month duration or below the $25,000 monetary threshold, the Prime Contractor will be in violation of the LWO. The BCA considers the accumulation of the amounts or terms of the separate subcontracts to determine the applicability of the LWO. The BCA shall inform the Awarding Authority that the Prime Contractor is not in compliance with the LWO and make recommendations pursuant to LAAC Section 10.37.6(g).

**(b) Reporting Requirements: Employee and Subcontractor Information and Subcontractor's Declaration of Compliance**

Within 30 days of execution of an Agreement subject to the LWO, Employers shall complete and submit the appropriate reporting forms referred to in Appendix A which list all Subcontractors and Employees working on the Agreement.

Employers are also responsible for notifying all Subcontractors of their LWO obligation and compliance requirements. Employers must include in any contract with Subcontractors provisions wherein the Subcontractor agrees to comply with the LWO. The City, as a third part beneficiary for purposes of the LWO, has the right to enforce the LWO against Subcontractors. Employers will be subject to LAAC Section 10.37.6(g) if their Subcontractors fail to comply with the LWO.

**(c) Notification:** An Employer subject to the LWO shall notify each current Employee, and each new Employee at time of hire, of his or her rights under the provisions of the LWO by providing the Employee with a copy of the Notice to Employees referred to in Appendix A.

17

**RULES AND REGULATIONS**
**IMPLEMENTING THE LIVING WAGE ORDINANCE**

An Employer subject to the LWO shall post in a prominent place in an area frequented by Employees a copy of the 1) Living Wage Poster and 2) the Notice Regarding Retaliation referred to in Appendix A. The Notice Regarding Retaliation must be posted by an Employer even if the Employer has been exempted from the LWO.

**(d) Payrolls**

The LWO requires Employers to retain payroll for a minimum of four years, unless more than four years of retention is specified elsewhere in the contract or required by law.

**(e) LWO Requirement of Minimum Compensation**

(1)  Employers subject to the LWO must pay covered Employees a "living wage" which shall be no less than the minimum compensation as defined in the LWO. If the Employer offers no health benefits, the Employer shall pay the Employee at least the full cash living wage rate, which include the wages in LAAC Section 10.37.2(a) and the health benefit payment in Section 10.37.3(a). If health benefits are offered, the Employer must comply with Regulation #12.

Wage rates may be adjusted each year, effective July 1. If an Employer has an Agreement in place with the City and the living wage rates are adjusted during the life of the Agreement, the Employer shall adjust the wage rate paid to an Employee to comply with the new wage rate. In accordance to LAAC Section 10.37.2(a)(1)(i)(b), 10.37.2(a)(2)(i) and 10.37.3(a)(5), the BCA shall provide notice of the new wage rate by publishing a bulletin announcing such wage adjustments.

Employers are not relieved of the obligation to adjust their wage rates because an individual notice was not received from the City. The Employer may contact the BCA to determine the wage rate adjustment, if any.

Wages do not include any amount paid to an Employee unrelated to the labor performed, such as allowances for parking, uniforms, meals, and contributions to retirement plans. If an Employee is paid by commission, it must be in accordance with State law and it must meet the required LWO hourly wage rate.

**(f) Health benefits**

Whether health benefits will be provided to Employees will be determined by the Employer. If the Employer elects not to provide health benefits, the full cash living wage rate must be paid to a covered Employee. If the Employer elects to provide a covered Employee with health benefits in accordance with these Rules and Regulations, proof of the provision of health benefits must be submitted to the BCA no later than 10 days after a request by the BCA for such documentation. If the documentation submitted does not allow the BCA to verify that health benefits are provided in accordance with the LWO and these Rules and Regulations, the Employer will be deemed in violation of the LWO until

18

**RULES AND REGULATIONS**
**IMPLEMENTING THE LIVING WAGE ORDINANCE**

sufficient documentation is received. Health Benefit rates will be adjusted yearly based on the percentage increase in the United State Bureau of Labor Statistics Consumer Price Index for All Urban Consumers: Medical Care Services as measured from January to December of the preceding year. Anytime Health Benefits are not provided by the Employer, except when a waiver that has been approved by the BCA, the Employee must receive the wage rate pursuant to LAAC Section 10.37.2(a)(1)(ii) and 10.37.2(a)(2)(ii).

**(g) Compensated and Uncompensated Time Off**

Unreasonably Deny: An Employer may not unreasonably deny an Employee's request to use accrued compensated or uncompensated time off. An Employee must notify the Employer in advance if the time off is planned, as may be the case with scheduled doctors' visits. If the need is unforeseeable, the Employee need only give notice as soon as practical, as may occur in the case of unanticipated illness or a medical emergency.

Adverse Action: The LWO protects the Employee for exercising the right to use compensated and uncompensated time off and prohibits retaliation in the form of discipline, discharge suspension or any other adverse action for use of compensated and uncompensated time off. However, this does not prevent an Employer from taking reasonable action (e.g. discipline) when an employee's use of paid time off is not in good faith, such as a clear instance or pattern of abuse.

Notification: An Employee must notify the Employer in advance if the compensated and uncompensated time off is planned, as may be the case with scheduled doctors' visits. If the need is unforeseeable, the Employee need only give notice as soon as practical, as may occur in the case of unanticipated illness or a medical emergency. In all cases, whether an employee can practicably provide notice depends upon the individual facts and circumstances of the situation.

Airport Employers: An Airport Employer can require a 4 hour notification period for absences. The Employer may reasonably consider consequences if clear instances of late notification or patterns of missed notification can be proven.

(1) **Compensated Time Off**

(A) Accrual and Usage: An Employee must accrue a minimum of 8 compensated hours off per month of full-time employment based on the Employee's regularly scheduled work hours. For example, a full-time Employee working a 40-hour work week must accrue compensated time-off at a rate of at least 8 hour per month. Accrual must begin the first day of employment so that by the end of one month, the Employee will have accrued no less than 8 hours off. A part-time Employee must accrue compensated days off in increments proportional to that accrued by a full-time Employee.

An Employee may determine how much compensated time off hours he or she

19

**RULES AND REGULATIONS**
**IMPLEMENTING THE LIVING WAGE ORDINANCE**

needs to use, provided that an Employer may set a reasonable minimum increment for use, not to exceed two (2) hours.

An employee must be eligible to use accrued paid days off after the first 90 days of employment or consistent with company policy, whichever is sooner.

(B) Providing More than 12 Compensated Days Off Per Year: An Employer may choose to provide Employees with more compensated days off than is required under the LWO and these Rules and Regulations. The BCA, after considering the totality of the circumstances, may determine that the Employer's established policy is more generous than what the LWO requires and allow an Employer's established compensated time off policy to remain in place, even though it does not meet the accrual rate and eligibility requirement in the LWO. The BCA will take into consideration the following when making a determination:

(i)   An Employer's policy provides an Employee with more days off so long as the total number of days off is at least 22 days, and at least 12 of the days are compensated days off; or

(ii)  If requiring the Employer to change its policy to comply with the LWO and these Rules and Regulations will result in the Employees receiving less benefits than provided under the Employer's established policy.

(C) Carry Over of Compensated Time Off: Unused compensated days off accrued by an Employee working on an Agreement must be carried over and may be capped at a minimum of 192 hours. An Employer may set a higher cap or no cap at all. Pursuant to LAAC Section 10.37.2(b)(3)(vi), an Employer shall provide a cash payment once every 30 days for accrued compensated time off over the maximum.

(D) Cash Out of Accrued Compensated Time Off: If there is no carry over cap, an Employer is not required to provide a cash payment unless otherwise required by law.

(2) **Uncompensated Time-Off:** At least 10 uncompensated days off shall be made available, as needed, for an Employee's illness or the illness of an immediate family member after an Employee has exhausted his or her compensated days off.

(A) Accrual and Usage: An Employee must accrue a minimum of 6.67 uncompensated hours off per month of full-time employment based on the Employee's regularly scheduled work hours. For example, a full-time Employee working a 40-hour work week must accrue uncompensated time-off at a rate of at least 6.67 hour per month. Accrual must begin the first day of employment so by the end of one month, the Employee will have accrued no less than 6.67

20

**RULES AND REGULATIONS
IMPLEMENTING THE LIVING WAGE ORDINANCE**

hours off. A part-time Employee must accrue uncompensated days off in increments proportional to that accrued by a full-time employee.

An Employee must be eligible to use accrued uncompensated days off after the first 90 days of employment or consistent with company policy, whichever is sooner.

(B) <u>Carry Over of Compensated Time Off:</u> Unused uncompensated days off accrued by an employee working on an Agreement must be carried over and may be capped at a minimum of 80 hours. An Employer may set a higher cap or no cap at all.

(3) **Retroactive Time-Off:** An Employer who fails to provide covered Employees with time off in accordance with the requirements of the LWO and these Rules and Regulations shall provide the affected Employees with the time off retroactive to the effective date of the Agreement. An Employer required to provide Employees with time off retroactively shall:

(A) Calculate the amount of compensated time off that the Employee should have accrued under the LWO. The Employer must immediately make available all the accrued time off. If the accrued time off owed exceeds 192 hours, the Employer must pay the Employee the cash value of the compensated time-off for any amounts owed above 192 hours. The amount to be paid to the Employee for the retroactive compensated time-off shall be calculated based on the current wage rate and, if Employer does not provide health benefits, shall include the required health benefit payment.

(B) Calculate the amount of uncompensated time off that the Employee should have accrued under the LWO. The Employer shall add the additional amount of uncompensated time-off that the Employees should have earned to the uncompensated time-off already accrued by the Employee. If the Employer has established a cap for at least 80 hours or more of uncompensated time off, any additional time off owed does not need to exceed that cap.

(C) Prior to October 5, 2016, calculation of compensated and uncompensated time off will not include any cap or cash payments in accordance to the previous Rules and Regulations.

**(h) Federal Earned Income Credit (EIC) – LAAC Section 10.37.4(b):**
Upon commencement of work on a City Agreement subject to the LWO or a subcontract related to the City Agreement, the Employer shall inform all Employees working on that Agreement of their possible right to EIC. The Employer shall also make available to Employees the forms necessary to secure advance EIC payments from the Employer. The Employer shall provide Employees with forms in English, Spanish, and other languages spoken by a significant number of the Employees, to the extent that such forms

21

**RULES AND REGULATIONS**
**IMPLEMENTING THE LIVING WAGE ORDINANCE**

are available from the Internal Revenue Service.

**(i) City Access to Employer Records to Monitor Compliance with the LWO**
An Employer subject to the LWO shall allow authorized City representatives access to work sites, upon request, in order to monitor compliance and investigate Employee complaints. An Employer shall submit, upon request, copies of payrolls, health benefit statements, and related documents to comply with the reporting requirements of the LWO, and to enable the BCA to fulfill its responsibilities as the Designated Administrative Agency. When necessary, the BCA may require the Employer to submit other documentation. Failure to submit documents or allow access to the work sites as requested will be deemed a violation of the LWO and these Rules and Regulations and may result in a recommendation to the Awarding Authority in accordance with LAAC Section 10.37.6(g).

**(j) Disclosure of Documents and Information**
Documents and information obtained in the course of the administration of the LWO become City records. Disclosure is subject to the provisions and limitations of the California Public Records Act (CPRA). Consistent with the CPRA, documents and information obtained during the course of an investigation or inquiry shall be kept confidential as permitted by applicable and except where compelled by law.

**(k) Prohibition Against Retaliation**
Even if an Employer is exempt from the wage and benefits provisions of the LWO, the Employer is still subject to LAAC Section 10.37.5 of the LWO regarding prohibition against retaliation for activities related to the LWO.

22

**RULES AND REGULATIONS**
**IMPLEMENTING THE LIVING WAGE ORDINANCE**

### REGULATION #7: REPORTING AND RECORD KEEPING

**(a) Providing Copies of Agreements to the BCA**

The Awarding Authority shall transmit a copy of each executed Agreement and related documents to the BCA. Agreements exempt from the LWO shall be submitted to the BCA along with an approved exemption form.

**(b) Annual Departmental Report**

The BCA may require Awarding Authorities to submit a report listing all Agreements employing low-wage earners for the period from July 1 to June 30. This report should be submitted within 15 working days of June 30 of a given year.

**(c) Annual LWO Wage Rate Adjustment**

The BCA shall advise the Awarding Authority of any adjustments to the LWO wage rate. The BCA shall notify Employers by publishing on its website a bulletin announcing the adjusted wage rates, which shall take effect on July 1 of each year. The BCA may also notify by mail those Employers within its database known to be subject to the LWO. The BCA may also notify Employers of the adjusted living wage rates by publishing the rates in a local newspaper of general circulation

The Employer shall provide notification of the rate adjustments to each of its Employees by posting in its workplace the posters and notices as required by LAAC Section 10.37.4(a). The Employer shall also notify any Subcontractor performing work on the City Agreement of the adjusted wage rate. The Subcontractor shall also notify its Employees of the wage rate adjustment by posting in its workplace the posters and notices as required by LAAC Section 10.37.4(a).

23

**RULES AND REGULATIONS**
**IMPLEMENTING THE LIVING WAGE ORDINANCE**


**REGULATION #8: MONITORING AND INVESTIGATION**

The provisions of these Rules and Regulations will augment the Awarding Authority's normal and customary procedure for administering its contracts. The BCA shall administer, monitor, and enforce the requirements of the LWO as follows:

**(a) Review of Agreements**
The BCA will be available to review all Agreements in cooperation with the Awarding Authority to ensure that relevant language and documents are included. The Awarding Authority shall incorporate the standard LWO contract language referred to in Appendix A into subject Agreements. If an Awarding Authority fails to include the required LWO language in an Agreement, the BCA may note that failure in its report to Council.

**(b) Employer Monitoring**
The BCA will monitor the operations of Employers to ensure compliance by conducting site visits and payroll audits. The BCA may review the provision of wages and benefits by an Employer as part of the site visits. An Employer shall cooperate with the BCA when a meeting, site visit, or documentation is requested by the BCA as part of its review. Cooperation includes providing the BCA with full to access to the work site for Employer and Employee interviews, and copies of certified payrolls, timesheets, health and benefit statements, employee policy manuals, and any other document which would assist the BCA in determining if an Employer is complying with the LWO. Requests by the BCA for meetings, site visits, employee interviews, and documents shall be made with reasonable notice. The BCA shall notify the Awarding Authority of each site visit.

**(c) Employer Review in Response to Specific Concerns or Complaints**
The BCA will perform an investigation when there is a specific concern or complaint about an Employer. If an Employee alleges a violation of the LWO or retaliation by the Employer, the BCA shall initiate the investigation pursuant to Regulation #10.

**(d) Employer's Failure to Cooperate**
If an Employer fails to produce requested documentation, fails to allow access to the work site or the Employees for Employee interviews, or otherwise fails to cooperate with the BCA, the BCA may deem the Employer to be in violation of LAAC Section 10.37.6(d) and may result in a recommendation to the Awarding Authority in accordance with LAAC Section 10.37.6(g).

**RULES AND REGULATIONS**
**IMPLEMENTING THE LIVING WAGE ORDINANCE**

**REGULATION #9: ENFORCEMENT**

**(a) Notice to Employer of LWO Violations**
If the BCA determines that the Employer has violated the LWO, the BCA will notify the Employer of the determination in a Notice to Correct and allow the Employer 10 working days to correct the violation. The BCA may, within its discretion, allow the Employer additional time beyond the 10 working days to make the corrections if the Employer demonstrates to the BCA that a good faith effort to comply has been made. The BCA shall notify the Awarding Authority of the Employer's failure to comply with the LWO and of the deadline by which corrections must be made. The BCA shall also notify a Prime Contractor of a Subcontractor's violation.

**(b) Failure to Correct or Comply**
Should the violation or failure to comply continue and/or no resolution is imminent, the BCA, in cooperation with the Awarding Authority, may pursue available remedies including: 1) the withholding of contract payments; 2) the impoundment of money; 3) termination of the contract as provided for in LAAC Section 10.37.6(g); 4) a declaration of non-responsibility from future City agreements, leases, licenses; and 5) any other remedy that may available to the City.

**(c) Prime Contractors Responsible for Subcontractor**
Prime Contractors shall be responsible for ensuring that violations of the LWO by their Subcontractors, sublessees, or sublicensees are cured within the time stated in the BCA's Notice to Correct. If the Subcontractor, sublessee, or sublicensee fails or refuses to comply or to make corrections, the BCA may determine that the Prime Contractor has violated the LWO.

25

**RULES AND REGULATIONS**
**IMPLEMENTING THE LIVING WAGE ORDINANCE**

**REGULATION #10: EMPLOYEE COMPLAINT PROCESS**

An Employee who alleges violation of any provision of the LWO by an Employer may report such acts to the BCA. The complaint to the BCA shall be handled as follows:

**(a) Employee Complaints**
An Employee making a complaint for a violation of the LWO must complete the complaint form referred to in Appendix A, which is available in English and Spanish.

**(b) Complaints Alleging Retaliation**
An Employee claiming retaliation (such as, termination, reduction in wages or benefits or adverse changes in working conditions) under LAAC Section 10.37.5 of the LWO may report the alleged retaliation in the same manner as provided in Subsection (a).

**(c) Investigation of Employee Complaints**
Upon receipt of a written Employee complaint, if the BCA has determined the complaint is valid, the BCA will initiate an investigation. Upon conclusion of the investigation, the BCA shall notify the Employee of the determination. If the BCA determines that the Employer is in violation of the LWO, the BCA will proceed pursuant to Regulation #9.

**(d) Confidentiality of Information During Investigation**
Consistent with the CPRA, information and records obtained by the BCA in the course of its complaint investigations, including the identity of the complainants and any witnesses, will be kept confidential as permitted by applicable law and except where compelled by law.

26

**RULES AND REGULATIONS**
**IMPLEMENTING THE LIVING WAGE ORDINANCE**

**REGULATION #11: RFP AND STANDARD LWO CONTRACT LANGUAGE**

Unless otherwise provided for within these Regulations, all RFPs, RFBs, and City Agreements must incorporate the standard LWO contract language referred to in Appendix A, or the most recent "Standard Provisions for City Personal Services Contracts" so long as the Standard Provisions contain the LWO contract language referred to in Appendix A.

27

**RULES AND REGULATIONS**
**IMPLEMENTING THE LIVING WAGE ORDINANCE**

**REGULATION #12: HEALTH CARE BENEFIT COSTS**

LWO § 10.37.2(a) gives Employers the option of paying Employees the living wage either fully in cash or largely in cash and partly by a health benefits payment of at least $1.25 per hour and $5.18 per hour (as of July 1, 2017) for Airport Employees (Airport Employees receive annual increases in rates pursuant to 10.37.3(a)(5)) (see Example 2). The intent of the LWO is to provide Employees with good benefits at no cost to the Employee.

LWO § 10.37.3(a)(5) establishes that the Health Benefit rate must be increased annually on July 1 of each year. The increase is based on the percentage of increase in the Consumer Price Index for All Urban Consumers: Medical Care Services as measured from January to December of the preceding year. To find the percentage increase using the data from the Consumer Price Index you must subtract the value for January from December of the previous year and divide the difference by the value for January. Then multiple that number by 100 to get the percentage increase for the following year (see Example 1).

Example 1:

**CPI-All Urban Consumers (Current Series)**

Series Id:     CUUR0000SAM2
Not Seasonally Adjusted
Series Title:  Medical care services in U.S. city average, all urban consumers, not seasonally adjusted
Area:          U.S. city average
Item:          Medical care services
Base Period:   1982-84=100

Download: .xlsx

| Year | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec | HALF1 | HALF2 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2007 | 359.757 | 363.908 | 365.164 | 366.070 | 367.127 | 367.758 | 370.008 | 371.461 | 372.432 | 374.750 | 376.250 | 376.940 | 364.964 | 373.640 |
| 2008 | 380.135 | 382.196 | 382.872 | 383.292 | 384.505 | 384.685 | 385.361 | 385.990 | 386.579 | 387.440 | 387.992 | 388.267 | 382.948 | 386.938 |
| 2009 | 391.365 | 394.047 | 394.837 | 395.753 | 396.648 | 396.750 | 397.868 | 398.303 | 399.160 | 400.015 | 401.392 | 401.452 | 394.900 | 399.698 |
| 2010 | 404.937 | 408.447 | 409.687 | 410.256 | 410.173 | 410.802 | 410.710 | 411.182 | 413.807 | 414.564 | 414.850 | 415.079 | 409.050 | 413.365 |
| 2011 | 417.025 | 420.567 | 420.852 | 421.716 | 422.438 | 422.813 | 423.847 | 424.546 | 425.258 | 427.467 | 429.191 | 430.005 | 420.902 | 426.719 |
| 2012 | 432.583 | 434.832 | 435.721 | 437.151 | 438.766 | 441.041 | 442.305 | 442.410 | 443.812 | 444.242 | 445.278 | 445.955 | 436.682 | 444.000 |
| 2013 | 448.226 | 451.625 | 452.596 | 452.083 | 451.648 | 453.325 | 453.773 | 456.062 | 457.458 | 457.135 | 456.855 | 457.296 | 451.584 | 456.430 |
| 2014 | 459.618 | 462.648 | 463.678 | 464.238 | 465.014 | 464.960 | 465.166 | 464.936 | 465.403 | 466.038 | 467.482 | 468.393 | 463.359 | 466.236 |
| 2015 | 470.030 | 471.138 | 472.645 | 476.163 | 476.800 | 475.546 | 475.956 | 475.189 | 476.466 | 480.245 | 481.894 | 481.983 | 473.720 | 478.622 |
| 2016 | 485.321 | 489.432 | 489.520 | 490.848 | 493.270 | 493.438 | 495.431 | 499.187 | 499.483 | 499.717 | 500.697 | 500.845 | 490.305 | 499.227 |
| 2017 | 502.948 | 506.105 | 505.991 | 505.855 | 505.611 | 505.813 | 506.681 | 507.390 | 508.078 | 509.256 | 508.879 | 509.045 | 505.387 | 508.222 |

509.045 (December Value) - 502.948 (January Value) = 6.097 (difference)
6.097 / 502.948 = 0.0121
0.0121 * 100 = 1.21% (percentage increase)

Example 2:

Using the July 1, 2017 health benefit payments required, Employers will be allowed to provide health care benefits through medical plans costing less than $1.25/$5.18 per hour, so long as the unused health benefits amount is added to the Employee's hourly

28

**RULES AND REGULATIONS**
**IMPLEMENTING THE LIVING WAGE ORDINANCE**

wage. For example, if the hourly rate with health benefits in effect is $11.27 per hour, an Employer with a health plan costing $1.00 per hour shall be required to increase the living wage rate from $11.27 to $11.52 per hour.

Example 3: Airport Employees - Using the July 1, 2024 required wage and health benefit payments, Employers must provide their Employees a total wage rate of $25.23 per hour. However, an Employer that provides its Employees with health benefits may receive a credit for the health benefits costs, up to a maximum of $5.95 per hour. For example, if an Employer's health benefits cost per Employee is $5.00 per hour, the minimum cash wage per Employee shall be $20.23 per hour. [$25.23 (total wage required) minus (-) $5.00 (Employer's health benefits cost)].  The maximum credit an Employer may receive shall not exceed the required health benefit payment in effect at that time. ($5.95 per hour effective July 1, 2024).  For Example, if an Employer's health benefits cost per Employee is $7.00 per hour, the minimum cash wage per Employee shall be $19.28 [$25.23 (total wage required) minus (-) $5.95 (maximum health benefits credit)].

29

**RULES AND REGULATIONS
IMPLEMENTING THE LIVING WAGE ORDINANCE**

**REGULATION #13: INSTALLMENT PAYMENTS OF AMOUNT DUE TO EMPLOYEES**

If corrective payments are required to be paid to Employees in order to cure a violation of the LWO, the Employer shall pay the entire amount due to each Employee in one payment within the time period required by the City in the Notice to Correct to the Employer. An Employer may pay an Employee the amount due in installments only when the Employee has agreed in writing to such a payment plan.

If an Employer obtains a written agreement from the Employee allowing the Employer to make corrective payments in installments, the agreement must indicate the amount due to the Employee, when such payments will be made, and the period of time over which payments will be made. Unless otherwise authorized by the City and agreed to by the Employee, all amounts due must be paid within six (6) months after the Notice to Correct was issued by the City.

The agreement must also provide that an Employee, who for any reason subsequently leaves the company's employment, shall be paid the remaining amount owed under the LWO immediately. Such agreements must be in language understandable to the Employee, and, if necessary, must be translated into the employee's primary language so that the Employee fully understands what the agreement entails. All such agreements must be submitted to the BCA to verify that the Employee has agreed to receive the corrective payments in installments.

If an Employee declines to execute such an agreement, the Employer must pay the entire amount due under the LWO to that Employee in one payment.

30

**RULES AND REGULATIONS**
**IMPLEMENTING THE LIVING WAGE ORDINANCE**

### REGULATION #14: INDUSTRY-SPECIFIC CLASSIFICATIONS

Pursuant to LAAC Section 10.37.1(k)(3)(iii) and 10.37.1(l)(3)(iii) Industry –Specific Classification is defined as any and all classifications working in a specific industry.

**<u>Past Determinations</u>**

All past determinations issued by the BCA or the DAA at that time, are valid and remain in effect for all Agreements and amendments to Agreements in effect prior to March 20, 2018.  The determinations shall remain in effect until otherwise modified, corrected, or rescinded by the BCA.

REVISED 3-20-2018

The past determinations can be found at:

https://bca.lacity.org/living-wages-ordinance-lwo

31

**RULES AND REGULATIONS
IMPLEMENTING THE LIVING WAGE ORDINANCE**

**REGULATION #15: COMPENSATED RELEASE TIME**

(a) Employers Subject to Compensated Release Time Requirement
Employer who holds a Certified Service Provider License Agreement (CSPLA) and is subject to the Living Wage Ordinance must give their employees 16 hours of compensated time off for Emergency Response training. According to LAWA's Certified Service Provider Program website, CSPLA Employers are companies who provide airfield and terminal services to an airline, tenant, recognized consortium, and/or service provider at LAX.

(b) Usage of Compensated Release Time
Employees must complete 16 hours of emergency response training on an annual basis. The 16 hours of Compensated Release time for training is to be provided every calendar year by the CSPLA Employer. The 16 hours of release time do not carry over or accumulate. The 16 hours of compensated release time should be paid at the Employee's regular rate of pay. Part time Employees are also entitled to 16 hours of Compensated Release Time to attend training. The 16 hours should become available for a non-new hire Employee to receive training after January 1st and can be used anytime during the calendar year.

(c) Required courses covered by Compensated Release Time
The emergency response training course must be a course approved by the Airport. The 16 hours of release time will only be used to attend the approved annual emergency response training courses.

(d) Failure to Comply
CSPLA Employers must provide their Employees with compensated release time as required by the LWO. If an Employer is found to have not provided their Employees with compensated release time, the DAA will issue a Notice to Correct to the CSPLA Employer. The Notice will be for the Employer to compensate their employees for the time off that they took to receive the required annual training that has been approved by the Airport. Failure to comply may lead to the Employer being subject to restitution payments to each Employee who did not receive compensated release time.

**RULES AND REGULATIONS
IMPLEMENTING THE LIVING WAGE ORDINANCE**

**APPENDIX A**

The forms listed below have been approved by the BCA for use in conjunction with these LWO Rules and Regulations. Forms may be revised and updated as necessary in which case the updated forms must be used.

| NO. | FORM NAME |
| --- | --- |
| LW-1 | Departmental Guidance Form |
| LW-4 | Pro-rated Time Off for Part-time Employees |
| LW-5 | Subcontractor's Declaration of Compliance |
| LW-6 | Employee Information Form |
| LW-10 | Non-Coverage/Exemption Application |
| LW-11 | Notice to Employees (flyer) (English) |
| LW-11sp | Notice to Employees (flyer) (Spanish) |
| LW-12 | Standard RFP/Contract Language |
| LW-18 | Subcontractor Information Form |
| LW-26a | Application for "Small Business Exemption" (English/Spanish) |
| LW-26b | Employee Worksheet for "Small Business Exemption" (English/Spanish) |
| LW-27 | Benefits Waiver Application |
| LW-28 | 501(C)3 Non-Profit Exemption Application |
| LW-29 | Non-Coverage Determination Application |

33

# EXHIBIT "C"

David W. Kesselman (SBN 203838)
*dkesselman@kbslaw.com*
Amy T. Brantly (SBN 210893)
*abrantly@kbslaw.com*
Mark Paluch (SBN 229202)
*mpaluch@kbslaw.com*
KESSELMAN BRANTLY STOCKINGER LLP
1230 Rosecrans Avenue, Suite 400
Manhattan Beach, CA 90266
Phone:  310-307-4555 | Fax: 310-307-4570

Melissa C. Allison (*Pro Hac Vice*)
*mallison@andersonkreiger.com*
Christina S. Marshall (*Pro Hac Vice*)
*cmarshall@andersonkreiger.com*
50 Milk Street, Floor 21
Boston, MA 02109
Phone: 617-621-6500 | Fax: 617-621-6600

*Attorneys for Defendant*
CITY OF LOS ANGELES DEPARTMENT OF
PUBLIC WORKS BUREAU OF CONTRACT
ADMINISTRATION

**SUPERIOR COURT OF THE STATE OF CALIFORNIA**

**COUNTY OF LOS ANGELES**

| | |
|---|---|
| SKYHOP GLOBAL LLC,<br><br>                  Plaintiff/Petitioner,<br><br>    v.<br><br>THE CITY OF LOS ANGELES DEPARTMENT OF PUBLIC WORKS BUREAU OF CONTRACT ADMINISTRATION, and DOES 1-10,<br><br>                  Defendants. | Case No.  24STCP00227<br><br>*Assigned for All Purposes to the Hon. Stephen I. Goorvitch, Dept. 82*<br><br>**REPLY IN SUPPORT OF DEMURRER OF DEFENDANT CITY OF LOS ANGELES**<br><br>Hearing Date: September 13, 2024<br>Time:        9:30 a.m.<br>Dept.:        82<br><br>Case Filed:    January 22, 2024<br>Trial Date:    Not Set |

## **TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................1

ARGUMENT .....................................................................................................................2

      I.     The Parameters of the Controversy Are Unclear Because the City is Still Investigating and SkyHop Has Refused to Cooperate. ..........................................2

      II.    SkyHop Faces No Imminent, Concrete Hardship Resulting from the LWO. .........5

CONCLUSION ..................................................................................................................8

## TABLE OF AUTHORITIES

**Cases**

*Amaral v. Cintas Corp. No. 2*,
   163 Cal. App. 4th 1157 (2008) ....................................................................................... 7

*Ass'n of Am. Med. Colls. v. U.S.*,
   217 F.3d 770 (9th Cir. 2000).................................................................................. 1, 2, 3

*Ass'n of Cmty. Orgs. for Reform Now v. Dep't of Indus. Rels.*,
   41 Cal. App. 4th 298 (1995) .......................................................................................... 4

*BKHN, Inc. v. Dep't of Health Servs.*,
   3 Cal. App. 4th 301 (1992) ..................................................................................... 5, 6, 7

*Chicago & S. Air Lines v. Waterman S.S. Corp.*,
   333 U.S. 103 (1948)....................................................................................................... 2

*City of Auburn v. Qwest Corporation*,
   260 F.3d 1160 (9th Cir. 2001)....................................................................................... 5

*Coral Construction, Inc. v. City & County of San Francisco*,
   116 Cal. App. 4th 6 (2004) ............................................................................................ 4

*Del Cerro Mobile Estates v. City of Placentia*,
   197 Cal. App. 4th 173 (2011) ................................................................................ 1, 6, 7

*Gardner v. Toilet Goods Association*,
   387 U.S. 167 (1967)....................................................................................................... 5

*Grossmont Union High Sch. Dist. v. State Dep't of Educ.*,
   169 Cal. App. 4th 869 (2008) ........................................................................................ 1

*Pac. Legal Found. v. California Coastal Comm'n*,
   33 Cal. 3d 158 (1982) .................................................................................................... 5

*Paramount Contractors & Developers, Inc. v. City of Los Angeles*,
   No. CV 07-159 ABC (JWJ), 2007 WL 9662264 (C.D. Cal. July 23, 2007) ................................ 3, 4

*Phelps v. State Water Resources Control Board*,
   157 Cal. App. 4th 89 (2007) .......................................................................................... 4

*Rakestraw v. Cal. Physicians' Serv.*,
   81 Cal. App. 4th 39 (2000) ............................................................................................ 1

*Reno v. Catholic Social Services, Inc.*,
   509 U.S. 43 (1993).......................................................................................................... 5

*Stormans, Inc. v. Selecky*,
   586 F.3d 1109 (9th Cir. 2009).......................................................................................... 6

Case No. 24STCP00227

REPLY IN SUPPORT OF DEMURRER OF DEFENDANT CITY OF LOS ANGELES

*Vandermost v. Bowen,*
    53 Cal. 4th 421 (2012) ........................................................................................................ 8

REPLY IN SUPPORT OF DEMURRER OF DEFENDANT CITY OF LOS ANGELES

**INTRODUCTION**

SkyHop's Complaint, and now its Opposition to the City's demurrer, confuse an investigation with a final decision, document requests with enforcement action, and the ordinary burdens of compliance with imminent, significant hardship. Along the way, SkyHop exaggerates what the City has done and is strategically vague about how those actions inflict hardship.

"Because a demurrer tests the legal sufficiency of a complaint, the plaintiff must show the *complaint* alleges facts sufficient to establish every element of each cause of action." *Rakestraw v. Cal. Physicians' Serv.*, 81 Cal. App. 4th 39, 43 (2000) (emphasis added). The Court should not "rewrite a complaint" by inserting facts the plaintiff did not plead. *Id.* at 43-44. Nor should the Court "accept as true legal conclusions stated in a complaint." *Grossmont Union High Sch. Dist. v. State Dep't of Educ.*, 169 Cal. App. 4th 869, 884 (2008). Finally, the Court should not grant leave to amend based on "[t]he assertion of an abstract right to amend." *Rakestraw*, 81 Cal. App. 4th at 43. These principles have especial force in a demurrer arguing that the complaint is unripe because the plaintiff has the burden of demonstrating ripeness. *Del Cerro Mobile Estates v. City of Placentia*, 197 Cal. App. 4th 173, 186 (2011),

Currently, the BCA is investigating all of the circumstances surrounding SkyHop and the LWO. That investigation is not final precisely because SkyHop refused to cooperate. If the BCA were able to complete its investigation, BCA might find that SkyHop is in compliance with the LWO, which SkyHop seems to argue when it pointedly "disputes" that it "is in violation of the LWO." Opp. at 7. The BCA might even agree with SkyHop that the LWO does not apply. The BCA could also find that SkyHop is in violation of the LWO but resolve the dispute without pursuing penalties for any number of reasons. Or the BCA might find that SkyHop is in violation of the LWO and pursue penalties—at which point the controversy would finally be ripe for adjudication. Ultimately, unless the BCA finishes its investigation or SkyHop is threatened with more imminent, concrete enforcement action, this dispute is not ripe for judicial resolution and should be dismissed. *See Ass'n of Am. Med. Colls. v. U.S.*, 217 F.3d 770, 781 (9th Cir. 2000) (administrative action not ripe for suit when investigation might not find violations and could still take many potential paths).

REPLY IN SUPPORT OF DEMURRER OF DEFENDANT CITY OF LOS ANGELES

# ARGUMENT

**I.      The Parameters of the Controversy Are Unclear Because the City is Still Investigating and SkyHop Has Refused to Cooperate.**

"An investigation, even one conducted with an eye to enforcement, is quintessentially non-final as a form of agency action." *Ass'n of Am. Med. Colls.*, 217 F.3d at 781. All SkyHop pleaded is that it has been threatened with enforcement action—not that any such action has been taken—for its refusal to cooperate with the BCA's inquiry.[1] It carefully has not alleged that the inquiry will find that SkyHop pays wages that violate the LWO. At several points, SkyHop asserts that complying with the LWO will cause it hardship, Opp. at 8 n.3, but at another, SkyHop pointedly "disputes" "that SkyHop is in violation of the LWO," Opp. at 7.

In any event, there is no final agency action and no ripe controversy because the inquiry is still ongoing, and no penalties have been imposed for SkyHop's failure to cooperate. Nothing about the BCA's inquiry "impose[s] an obligation, den[ies] a right, or fix[es] some legal relationship as a *consummation* of the administrative process." *Ass'n of Am. Med. Colls.*, 217 F.3d at 781 (quoting *Chicago & S. Air Lines v. Waterman S.S. Corp.*, 333 U.S. 103, 113 (1948)). As the Ninth Circuit concluded in *Association of American Medical Colleges*,

> [O]n the facts before this court it is an open question whether the . . . audits will actually result in findings of [violations]. For obvious reasons, plaintiffs have not admitted in their pleadings that they stand in violation of the Medicare Act . . . . [The Court] might infer this fact, but its absence from the *record* demonstrates a lack of finality. [The government] could still modify its . . . view of the Act's requirements . . . and, for any number of reasons, the . . . audit may not reveal significant violations. Even if violations are found, there are a panoply of administrative and judicial remedies open to the [government] . . . . And only one of those remedies . . . presents the dire Hobson's choice plaintiffs complain of.

*Id.* There are analogous open questions here: whether the BCA will find any LWO violations—indeed, SkyHop denies that there are any, Opp. at 7; if it does, whether the BCA or other arms of City government will pursue concrete enforcement action; and if they do, what form that action will take.

---

[1] Nor has SkyHop amended its Complaint, filed January 18, 2024, to allege any further enforcement action.

SkyHop tries to cast the December 7, 2023 Notice to Correct as an appealable agency action. But it cites no authority for the proposition that what is in effect a document demand constitutes final agency action, and that position is directly contrary to *Association of American Medical Colleges*, which instructs courts to let investigations run their course even if the investigation is alleged to be *ultra vires.* 217 F.3d at 784 n.9 (even if "substantial constitutional violations are alleged . . . the claim must still be ripe for review before courts will exercise jurisdiction"). SkyHop's argument that the investigation itself is unlawful because SkyHop is not subject to the LWO, Opp. at 7, fails for the same reasons. *Id.*

It also bears repeating that the City has the same or broader powers to audit SkyHop under the NELA as under the LWO. Mem. at 5-6. The City's entitlement to records under the NELA is not limited to "documents reflecting SkyHop's 'revenue . . . and a daily record of all trips and the passenger counts and fares collected,'" as SkyHop argues. Opp. at 10. The very next section of the NELA gives the City "at all reasonable times . . . the right of access to and the right to examine and audit all records of Licensee pertaining to the operations of its business under this License." Compl., Ex. A § 5.3.2 (emphasis added). Once SkyHop violated this requirement by refusing to provide the requested records, the NELA authorized the City to do exactly what the BCA did: issue a Notice to Correct requiring compliance within ten days, on pain of *possible* future termination of the NELA. *Id.* § 17.1. Thus, it makes no difference that BCA referred to the LWO, not the NELA, throughout the inquiry. *See* Opp. at 10.

SkyHop cites several cases to argue that "seek[ing] to enforce a party to comply with [a] statute or ordinance" automatically creates a "ripe" controversy. Opp. at 7. However, each case is distinguishable.

- In *Paramount Contractors & Developers, Inc. v. City of Los Angeles*, No. CV 07-159 ABC (JWJ), 2007 WL 9662264 (C.D. Cal. July 23, 2007), there was a demonstrated, ongoing violation whose parameters were clear. The plaintiff, who was maintaining permanent physical signs without required permits, demonstrated that it "*would* incur costs in taking down the unpermitted signs and losing the revenue generated by them, and it *would* be subject to fines and potential imprisonment if it left the signs up." *Id.*

at *7-8.  The court contrasted these circumstances with another case where a party's claim for declaratory relief concerning its right to establish signs was "unripe because the plaintiff failed to first obtain a final permit denial from the City." *Id.* at *8.  Here, it is still unknown whether SkyHop has violated the LWO, let alone what enforcement action the City might take in response, precisely because there has been no "final" decision from the City.

- In *Coral Construction, Inc. v. City & County of San Francisco*, 116 Cal. App. 4th 6 (2004), the alleged injury—competitive disadvantage in bidding—had already occurred, and the plaintiff further demonstrated that it was likely to recur.  *Id.* at 21-26.  SkyHop has made no similar showing of past or likely future injury.
- *Phelps v. State Water Resources Control Board*, 157 Cal. App. 4th 89 (2007) held that facial challenges to certain license provisions were time-barred because they were ripe as soon as the licenses issued.  *Id.* at 103.  It is not an enforcement case and provides no support for SkyHop's assertion.

SkyHop also relies on the City's "repeated[] assert[ions] that the LWO applies to SkyHop" to demonstrate that there is a concrete controversy.  Opp. at 7.  These "assertions" do not reflect a final decision.  At most, they show that the BCA presumed that the LWO applies.  *Ass'n of Cmty. Orgs. for Reform Now v. Dep't of Indus. Rels.*, 41 Cal. App. 4th 298, 300 (1995) (noting in dicta that allegations that the "state has forced [plaintiff] to disclose information regarding compensation of its employees and 'by its actions and statements has indicated . . . its view that California's labor laws are applicable to Plaintiff'" did not suggest ripe controversy).  A presumption is not a final decision.[2]

Indeed, SkyHop's own conduct belies any contention that the City's communications constitute an administrative decision that the LWO applies to SkyHop.  The messages SkyHop

---

[2]  This presumption was reasonable.  Whether or not SkyHop holds a NELA, airlines' "contractors" and "subcontractors," as defined in the LWO, are themselves independently subject to the LWO, and SkyHop appears to be a contractor or subcontractor to the airlines.  *See* LWO § 10.37.1(f), (i)(5) (k), (m).  This is why, after SkyHop laid out its position to the BCA, the BCA asked for SkyHop's airline contracts.   Any airline contract with a "Contractor or Subcontractor . . . shall contain a provision wherein the . . . Contractor or Subcontractor agree[s] to comply with this article [the LWO]."  LWO § 10.37.8.  Knowing whether SkyHop's airline contracts contain such a provision was obviously relevant to the BCA's inquiry and what next steps were appropriate.

REPLY IN SUPPORT OF DEMURRER OF DEFENDANT CITY OF LOS ANGELES

complains about were sent February 28, 2023; October 10, 2023; and October 18, 2023.  *See* Opp. at 4.  If any one of these emails constituted an administrative decision "unilaterally applying the LWO" to SkyHop, SkyHop should have appealed promptly or risk waiver or estoppel.  Instead, it did not file this Complaint until months later.

**II.    SkyHop Faces No Imminent, Concrete Hardship Resulting from the LWO.**

A dispute over administrative agency action is not ripe unless "withholding court consideration" results in "hardship" that is both "imminent" and "significant."  *Pac. Legal Found. v. California Coastal Comm'n*, 33 Cal. 3d 158, 173 (1982).  Contrary to SkyHop's assertions, Opp. at 9, merely "risk[ing] penalties for failure to comply with such a statute" does not mean that "hardship exists such that the controversy is ripe."  *See BKHN, Inc. v. Dep't of Health Servs.*, 3 Cal. App. 4th 301, 310 (1992) (holding assertion that corporation "might be penalized for failure to cooperate" with state agency was "speculative at best").  This argument has no limiting principle.

Neither of the cases cited by SkyHop holds otherwise.  In *City of Auburn v. Qwest Corporation*, 260 F.3d 1160 (9th Cir. 2001), *overruled on other grounds*, there "c[ould] be no question that Qwest [wa]s violating the ordinances."  *Id.* at 1172.  Here, there is much greater uncertainty.  Despite SkyHop's insistence that complying with the LWO would be burdensome, Opp. at 7, 8 n.3, SkyHop also specifically denies that it is in violation of the LWO and certainly has not actually pleaded that it pays wages that would violate the LWO if the LWO applied.  And SkyHop is simply wrong when it says that the Supreme Court held in *Reno v. Catholic Social Services, Inc.*, 509 U.S. 43, 57 (1993) that the regulations at issue presented an "immediate dilemma."  Opp. at 9.  In *Reno*, the Supreme Court found that "the promulgation of the challenged regulations did not itself give each . . . class member a ripe claim."  509 U.S. at 59.  In the language SkyHop quotes from *Reno*, the Supreme Court is describing a different case altogether.  *Id.* at 57-58 (describing *Gardner v. Toilet Goods Association*, 387 U.S. 167 (1967)).

Ultimately, SkyHop's Opposition identifies only two specific types of hardships.  Neither of them is imminent, significant, or traceable to the LWO.

First, SkyHop claims that the City "has threatened to terminate SkyHop's NELA" which, "in and of itself, presents substantial hardship to SkyHop."  Opp. at 9.  This argument is wrong on both

REPLY IN SUPPORT OF DEMURRER OF DEFENDANT CITY OF LOS ANGELES

the facts and the law.  As far as the facts go, the BCA has threatened only to recommend to other city officials (LAWA) that they terminate SkyHop's NELA, which is all the BCA can do with respect to termination.  Allison Decl., Ex. A.  SkyHop, which has the burden of demonstrating ripeness, has not alleged, let alone shown any likelihood, that the BCA will make that recommendation or that LAWA would take the BCA's recommendation.  Thus, any harm is not imminent.  *BKHN, Inc.*, 3 Cal. App. 4th at 311-12.

The claim of hardship is also legally defective because SkyHop does not, and cannot, explain how the *threat* of future enforcement for failure to provide documents "in and of itself, presents [concrete] hardship" as SkyHop claims.  No "immediate and significant change in [SkyHop's] conduct of [its] affairs" is demanded.  *U.S. News & World Report, L.P. v. Chiu*, No. 24-cv-00395-WHO, 2024 WL 2031635, at *15 (N.D. Cal. May 7, 2024) (quoting *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1126 (9th Cir. 2009)) (second alteration in original).  All that is "demanded" is documents, and that demand is not traceable to the LWO alone and would not be redressed by declaratory relief against the LWO.  Mem. at 5-6.  Again, SkyHop's refusal to cooperate with the BCA's inquiry violated the NELA and exposed SkyHop to a threat of termination under the terms of the NELA itself.  *BKHN, Inc.*, 3 Cal. App. 4th at 310 (holding alleged dispute over applicability of remedies clause in state statute unripe because federal statute provided for the same remedies).

SkyHop's comment that the City "has not even suggested that, in the future, it will not take further action against SkyHop based on the supposed application of the LWO," Opp. at 10, is an improper attempt to shift the burden.  As the plaintiff, SkyHop bears the burden to demonstrate the existence of an imminent, concrete hardship.  *Del Cerro Mobile Estates*, 197 Cal. App. 4th at 186.  The City does not bear the burden to show that no future hardship will ever arise.

Second, SkyHop claims that "being subject to the LWO would place SkyHop in substantial legal peril" because of the private and public remedies for LWO violations.  Opp. at 9-10.  SkyHop cites no authority showing that the mere existence of remedies that could conceivably be used in the future constitutes "substantial legal hardship."  Instead, the fact that SkyHop has to rely on the mere existence of potential remedies—only one of which has even arguably been used against SkyHop at

REPLY IN SUPPORT OF DEMURRER OF DEFENDANT CITY OF LOS ANGELES

this point—to demonstrate that it faces imminent, significant hardship just goes to show that SkyHop's Complaint is premature.

**Private remedies.**  SkyHop first cites the private right of action the LWO creates for employees who are paid substandard wages.  Opp. at 9-10.  This is mere speculation that a third party might bring suit in the future, not evidence of "imminent" hardship.  *BKHN*, 3 Cal. App. 4th at 312 (holding that risk of dispute among codefendants in environmental cleanup proceeding was "speculative at best"); *Del Cerro Mobile Estates*, 197 Cal. App. 4th at 186 (even if defendant "contemplate[d] action and marshall[ed] legal arguments  to support *potential* action . . . [plaintiff's] claims in resisting demurrer about accelerated [action] that might *or might not* occur in the future were not ripe").  SkyHop has not alleged that it pays substandard wages such that it is vulnerable to suit, let alone that it has been threatened with any such litigation.  Opp. at 7.  In any event, SkyHop does not need to take immediate legal action against the City to address this supposed threat.  If a lawsuit does materialize, SkyHop can defend itself on the ground that the LWO is inapplicable.  *See, e.g.*, *Amaral v. Cintas Corp. No. 2*, 163 Cal. App. 4th 1157, 1174-85 (2008) (discussing contractor's various challenges to applicability of Hayward Living Wage Ordinance).  SkyHop may also have credible arguments that any violations were not willful—cutting off liability for multiple damages— because it had a good-faith basis to dispute whether the LWO applied.  *Id.* at 1201-02.

**Public remedies.**  SkyHop then claims that the possibility of being subject to the LWO places it in "substantial legal peril" that amounts to imminent, significant hardship because the LWO gives the City the power to "terminate any contract or otherwise pursue legal remedies against an employer who . . . fails to comply with the LWO . . . audit an employer at any time to verify compliance . . . [or] impose a civil penalty."  Opp. at 10.  This argument proves far too much.  The risk that another party *could* pursue remedies *if* a violation occurs is inherent to any statute or contract, and does not amount to imminent, significant hardship.  SkyHop might as well say that merely having a NELA with the City places SkyHop in "substantial legal peril" because if it ever violates the NELA, the City might pursue contractual remedies.  This would stretch the idea of "imminent" and "significant" hardship past the breaking point.  And again, SkyHop's own conduct

REPLY IN SUPPORT OF DEMURRER OF DEFENDANT CITY OF LOS ANGELES

belies its assertion that the alleged hardship is "imminent": it waited more than a month after the Notice to Correct to even file suit.

The only power that the City has exercised so far is the power to audit SkyHop. But the City has that power under the NELA irrespective of whether the LWO applies, and the facts that SkyHop is being audited, that audit is still ongoing, and that the City has not yet pursued any other remedy show that this claim is unripe.[3]

<b><u>CONCLUSION</u></b>

For the foregoing reasons, the Complaint should be dismissed as unripe.

Dated:  September 6, 2024                    Respectfully submitted,


By:    /s/ Melissa C. Allison
       Melissa C. Allison (*Pro Hac Vice*)
       Christina S. Marshall (*Pro Hac Vice*)
       ANDERSON & KREIGER LLP

       David Kesselman (#203838)
       KESSELMAN BRANTLY STOCKINGER LLP

       *Attorneys for Defendant*
       CITY OF LOS ANGELES DEPARTMENT OF
       PUBLIC WORKS BUREAU OF CONTRACT
       ADMINISTRATION

---

[3]  The City did not rely on *Vandermost v. Bowen*, 53 Cal. 4th 421 (2012) to show that "SkyHop's claims for writ relief are unripe." Opp. at 12. Instead, the City cited *Vandermost* only to show that claims for writ relief must be ripe for judicial review, like any other. Mem. at 4. SkyHop does not ultimately dispute that the same ripeness principles apply to all three of its causes of action.